[No. 37236.  En Banc.  November 4, 1965.]

EVANGELICAL UNITED BRETHREN CHURCH OF ADNA *et al.*,
*Respondents*, v. THE STATE OF WASHINGTON,
*Appellant.*\*

*\*Reported in 407 P.2d 440.

*The Attorney General* and *Stephen C. Way, Assistant,* for appellant.

*Murray, Armstrong & Vander Stoep,* for respondents.

HAMILTON, J.—At about 8:30 p.m., on April 2, 1962, a 14-year-old boy escaped from the custody of the state maintained juvenile correction facility designated as Green Hill School and located at Chehalis, Washington. The boy thereafter set fire to the Evangelical United Brethren Church and to a house owned by Oliver E. Davis and his wife. Both structures were destroyed in the blaze. The owners initiated this suit against the state of Washington seeking recoupment for their loss. They alleged that the

state in operating the school was negligent in that it applied only minimal security measures to the boy when it knew or should have known that the boy had a "propensity for incendiarism" and was a "pyromaniac."

After unsuccessfully seeking dismissal of the action, the state answered denying the material allegations of the complaint, and the cause was tried and submitted to a jury. It returned a verdict for the owners and against the state. The state appeals, assigning error to the denial of its various motions, the granting of a trial amendment, and the giving of an instruction.

Briefly, the salient facts are as follows: The boy involved had never known his real father, had been rejected by his mother at an early age, and had spent almost all of the first 12 years of his life in foster homes or with his grandparents. On October 8, 1959, at the age of 12, he was adjudged a juvenile delinquent upon the basis of an admission that he had set four fires, and engaged in other antisocial behavior. He was received at the State Diagnostic and Treatment Center on November 5, 1959, and, following a diagnostic period during the course of which he ran away from the center but returned of his own volition within a few hours, went before the center's review board on December 17, 1959. He was diagnosed as dangerously psychotic in an assaultive vein, and transferred to Northern State Hospital, a mental facility, on February 1, 1960. Some benefits flowed from hospitalization and, on March 29, 1960, he was transferred for further treatment to the juvenile mental treatment facilities of Western State Hospital with a provisional diagnosis of "Inadequate personality, with psychotic reaction." At Western State Hospital his condition improved and, on May 18, 1960, he was discharged and returned to the Diagnostic and Treatment Center with a diagnosis of "Personality pattern disturbance, inadequate personality." The boy again appeared before the center's review board. The board expressed its belief that he was still dangerously psychotic with assaultive tendencies toward smaller children and in addition constituted a security risk as a potential escapee. He was there-

upon transferred to the Green Hill School arriving there about June 3, 1960.

Green Hill School is one of the several juvenile correctional and rehabilitative facilities falling under the jurisdiction of the Department of Institutions of the state. In keeping with the purposes and philosophy of the Juvenile Court Law (RCW 13.04 and RCW 72.05.210), the underlying objective of the school is to correct and rehabilitate youthful delinquents (RCW 72.05.010). The school is characterized by statute as a "close security" institution, to which shall be sent male children between the ages of 8 and 18 with the most serious behavior problems (RCW 72.05.130 and 72.16.070), the phrase "behavior problems" being synonymous with the terms "delinquent" and "delinquency" as used in the Juvenile Court Law (RCW 72.05.210).

At Green Hill School it was the established policy, within the framework of its basic rehabilitative purpose, its characterization as a "close security" institution, and the varying age and behavioral patterns of its inmates, to seek to gear the security and control measures provided to an inmate to the ability of the boy to recognize and accept reformation and responsibility. These variable security measures were reflected in the arrangement of the living quarters, or "cottages" as they were called, provided for the boys. At the times here in question there were 10 cottages available, each bearing the name of a type of tree, and each providing a security program and resident supervision designed to reflect the needs, capacity, and progress of the boys assigned to them. For example, "Cedar" cottage was a two-story concrete structure accommodating approximately 14 or 15 boys in single occupancy, locked, cubicles from whence the boys, in controllable groups, were released for in-cottage dining, sanitary, recreational, and educational purposes under strict supervision. Assignment to restricted work details and school classes outside the cottage was allowed only after a boy had amply demonstrated the requisite degree of responsibility. In short, "Cedar" cottage provided maximum security and discipli-

nary isolation when required. It represented that which was referred to by the officials as the "close program" within the institution. The remaining nine cottages represented that which was referred to as the "open program." These cottages consisted of one next to and similar in structure and physical design to Cedar, housing upwards of 32 boys in double occupancy cubicles, designated as "Oak" cottage; two dormitory type facilities designated as "Alder" and "Pine"; and six tree named residential type cottages quartering 16 boys each. Although these cottages maintained similar in-cottage direction and supervision, each cottage became progressively less restrictive relative to assignment to work details, unescorted movement between details and school classes, recreational outlets, and inter-cottage association.

Assignment to work details and supervision thereof was also utilized in a manner consistent with evaluation of an inmate's progress in acceptance of responsibility. A high degree of supervisory security on a detail would be a ratio of one staff member or employee to one boy, and the least amount of supervision was represented by the farm or garden detail on which a considerable number of boys would be assigned to the direction and supervision of one staff member or employee.

When the boy with whom we are here concerned arrived at Green Hill School on or about June 3, 1960, he appeared before an "Initial Review Board" composed of professionally trained staff members of the school. His case history was reviewed, supervision techniques recommended, and a tentative program, involving assignment to Oak Cottage, was adopted. His life and conduct thereafter at the school were relatively uneventful. He attended academic classes, worked on various details, including the garden detail, and was allowed to make occasional visits to the home of his grandparents from whence he always promptly returned. He did not evidence any "runaway" tendencies nor present any serious disciplinary problem. The only occurrence of any significance took place on New Year's Eve in 1961, when the inmates of Oak Cottage were allowed to

stay up until midnight, at which time things got out of hand, windows were broken and some paper was set afire. He, along with nine other boys, was disciplined for participating in the fire incident.

In September, 1961, the boy was paroled from Green Hill School to reside with his maternal aunt and uncle. He entered school and was enrolled in a church-sponsored youth group. His adjustment on parole was unsatisfactory. Friction developed between him, his aunt, and his cousins. He was accused of striking another student at school, breaking the windows of the church which sponsored his youth group, and of partially burning a boat. On February 1, 1962, he ran away from the home of his aunt and uncle and returned to the home of his grandparents, where he was apprehended on February 3 and remanded to the Diagnostic and Treatment Center. On March 9, 1962, he was returned to Green Hill School with a report and recommendation that he be regarded as a security risk and be accorded close supervision. He again appeared before the review board of the school and was reassigned to Oak Cottage.

On April 2, 1962, in the course of the afternoon, he was assigned to the boiler room detail, a detail involving a one-to-one ratio of supervision; that is, one boy under the supervision of an employee of the school. With the exception of a short time when he attended another class, the boy remained upon this detail performing satisfactorily until approximately 8:30 p.m., at which time he disappeared at a moment when the attendant's back was turned in the performance of a routine task in connection with the work involved on the detail. Local law enforcement agencies were notified of the escape, and thereafter, during the late hours of the night, the boy set the fires which constituted the basis of this action.

Plaintiffs predicate their action against the state upon the provisions of Laws of 1961, ch. 136, § 1, p. 1680 (RCW 4.92.090),[1] the pertinent portion of which reads:

[1]RCW 4.92.090 was amended by Laws of 1963, ch. 159, § 2, p. 753, and now provides:

"The state of Washington, whether acting in its governmental or

The state of Washington, whether acting in its governmental or proprietary capacity, hereby consents to the maintaining of a suit or action against it for damages arising out of its tortious conduct to the same extent as if it were a private person or corporation.

In support of their action, plaintiffs' allegations of fault fall into four categories which they assert constituted culpable negligence on the part of the state: (1) The maintenance of an "open program" at Green Hill School; (2) the assignment of the boy in question to the "open program"; (3) the assignment of the boy to the boiler room detail; and (4) failure to timely notify local law enforcement agencies of the boy's escape. It is not contended that the boiler room attendant was in anywise negligent in his supervision of the boy.

The state, on the other hand, in support of its assignments of error directed to the denial of its various motions for dismissal, contends that the decisions, acts, or omissions complained of involve the exercise of administrative judgment and discretion and cannot properly be characterized as tortious conduct, or, if not, that the evidence is insufficient to support a finding that the state could reasonably have foreseen the boy's escape and depredations.

■ There can be no question but that by the enactment of Laws of 1961, ch. 136, § 1 (RCW 4.92.090) the legislature intended to abolish on a broad basis the doctrine of sovereign tort immunity in this state, and we have so held in *Kelso v. Tacoma*, 63 Wn.2d 913, 390 P.2d 2 (1964), and *Hosea v. Seattle*, 64 Wn.2d 678, 393 P.2d 967 (1964).

The statute, however, is not as broad as it possibly could have been written. Although it does not contain the varied exceptions found in the Federal Tort Claims Act (60 Stat. 842 (1946), 28 U.S.C.A. §§ 1346, 1402, 1504, 2110, 2401, 2402, 2411, 2412, 2671, 2680), it does contain limitations. State government is rendered liable for damages only when such damages arise out of "tortious conduct to the same ex-

proprietary capacity, shall be liable for damages arising out of its tortious conduct to the same extent as if it were a private person or corporation."

tent as if it were a private person or corporation." Essentially, then, the official conduct giving rise to liability must be *tortious,* and it must be analogous, in some degree at least, to the chargeable misconduct and liability of a private person or corporation. Thus, the statute does not render the state liable for every harm that may flow from governmental action, or constitute the state a surety for every governmental enterprise involving an element of risk. Negligent conduct, within accepted tort concepts, must be present.

Initially then, it is necessary to determine where, in the area of governmental processes, orthodox tort liability stops and the act of governing begins, for as stated by Mr. Justice Jackson in his dissent in *Dalehite v. United States,* 346 U.S. 15, 97 L. Ed. 1427, 73 Sup. Ct. 956 (1953), "it is not a tort for government to govern." It is a gross understatement to say, however, that marking a definitive dividing line, with any degree of clarity or certainty, is fraught with some legal as well as factual difficulty. Essentially, the line of demarcation should present a question of law, although in some instances it may well give rise to a mixed question of law and fact.

■   Practically all jurisdictions that have broken varying amounts of ground in the abdication of governmental immunity from tort liability have judicially, if not statutorily, recognized that the legislative, judicial, and purely executive processes of government, including as well the essential quasi-legislative and quasi-judicial or discretionary acts and decisions within the framework of such processes, cannot and should not, from the standpoint of public policy and the maintenance of the integrity of our system of government, be characterized as tortious however unwise, unpopular, mistaken, or neglectful a particular decision or act might be. *Dalehite v. United States, supra; Hargrove v. Town of Cocoa Beach,* 96 So.2d 130, 60 A.L.R.2d 1193 (Fla. 1957); *Weiss v. Fote,* 7 N.Y.2d 579, 200 N.Y.S.2d 409 (1960); *Muskopf v. Corning Hosp. Dist.,* 55 Cal.2d 211, 11 Cal. Rptr. 89, 359 P.2d 457 (1961); *Lipman v. Brisbane Elementary School Dist.,* 55 Cal.2d 224, 11 Cal.

Rptr. 97, 359 P.2d 465 (1961); *Williams v. Detroit,* 364 Mich. 231, 111 N.W.2d 1 (1961); *Holytz v. Milwaukee,* 17 Wis.2d 26, 115 N.W.2d 618 (1962); *Spanel v. Mounds View School Dist.,* 264 Minn. 279, 118 N.W.2d 795 (1962).

The reason most frequently assigned is that in any organized society there must be room for basic governmental policy decision and the implementation thereof, unhampered by the threat or fear of sovereign tort liability, or, as stated by one writer "Liability cannot be imposed when condemnation of the acts or omissions relied upon *necessarily* brings into question the propriety of governmental objectives or programs or the decision of one who, with the authority to do so, determined that the acts or omissions involved should occur or that the risk which eventuated should be encountered for the advancement of governmental objectives." Peck, The Federal Tort Claims Act, 31 Wash. L. Rev. 207-40 (1956). See also Comment, Abolition of Sovereign Immunity in Washington, 36 Wash. L. Rev. 312 (1961).

Recognizing the need and reason for a limitation on sovereign tort liability is one thing. Establishing guidelines for its application, however, is another matter, particularly in the area involving executive or administrative discretion. The United States Supreme Court, in *Dalehite v. United States, supra,* finds that the distinction between discretionary and nondiscretionary administrative acts, omissions, or decisions may well lie in the determination of whether such was done or made at the "planning" or "operational" level. The California Supreme Court suggests the distinction, with necessary refinements, lies between "discretionary" and "ministerial" conduct. *Muskopf v. Corning Hosp. Dist., supra; Lipman v. Brisbane Elementary School Dist., supra.* It has likewise been indicated that a distinction may be found between performance of and the failure to perform a required act. *Indian Towing Co. v. United States,* 350 U.S. 61, 100 L. Ed. 48, 76 Sup. Ct. 122 (1955). And, it has been hinted that the characterization of administrative conduct or functions as "mental" or "menial" may provide assistance in some instances. All

approaches, however, appreciate the complexity of the problem.

■ Whatever the suitable characterization or label might be, it would appear that any determination of a line of demarcation between truly discretionary and other executive and administrative processes, so far as susceptibility to potential sovereign tort liability be concerned, would necessitate a posing of at least the following four preliminary questions: (1) Does the challenged act, omission, or decision necessarily involve a basic governmental policy, program, or objective? (2) Is the questioned act, omission, or decision essential to the realization or accomplishment of that policy, program, or objective as opposed to one which would not change the course or direction of the policy, program, or objective? (3) Does the act, omission, or decision require the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved? (4) Does the governmental agency involved possess the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act, omission, or decision? If these preliminary questions can be clearly and unequivocally answered in the affirmative, then the challenged act, omission, or decision can, with a reasonable degree of assurance, be classified as a discretionary governmental process and nontortious, regardless of its unwisdom. If, however, one or more of the questions call for or suggest a negative answer, then further inquiry may well become necessary, depending upon the facts and circumstances involved.

From the foregoing we turn to the situation presented in the instant case. Examination of pertinent statutory provisions reveals that this state, as early as 1905,[2] and in keeping with policies established in other states of the nation, made a policy determination with respect to the care and correction of delinquent youngsters. It enacted a Juvenile Court Law (RCW 13.04) the basic policy of which was to treat delinquent children, rather than banish

[2]Laws of 1905, ch. 18, p. 34; Laws of 1909, ch. 190, p. 668: Laws of 1913, ch. 160, p. 520.

or punish them, and to provide such environment, where required, as would encourage and permit such a child to grow into useful citizenship. *In re Lewis*, 51 Wn.2d 193, 316 P.2d 907 (1957); *In re Lundy*, 82 Wash. 148, 143 Pac. 885 (1914). In consonance with this policy and supplementary to the Juvenile Court Law, the state has, over the years, authorized and maintained various juvenile correctional and rehabilitative facilities ranging from diagnostic and treatment centers through forest camps to facilities such as Green Hill School. The establishment, management, and government of such facilities have been, by statute, delegated to the Department of Institutions (RCW 72.01-.050, 090, 100), the director of which is appointed by the Governor with the advice and consent of the Senate (RCW 72.01.020). Parenthetically, it should be observed that the Director of the Department of Institutions likewise has under his jurisdiction the other public institutions of the state, *i.e.*, soldiers and veterans homes, schools for the handicapped and retarded, mental hospitals, and adult reformatory and penal facilities.

Within the organizational framework of the Department of Institutions, and to aid in carrying out the director's responsibilities with respect to the state's juvenile policy, the legislature has created the Division of Children and Youth Services (RCW 72.05.030), the purpose of which, so far as here pertinent, is declared by RCW 72.05.010 to be:

> To provide for every child with behavior problems . . . such care, guidance and instruction, control and treatment as will best serve the welfare of the child or person and society; . . . and to provide for the persons committed or admitted to those schools that type of care, instruction, and treatment most likely to accomplish their rehabilitation and restoration to normal citizenship.

To accomplish the purposes and objectives, the Director of the Department of Institutions, together with the Division of Children and Youth Services, is empowered to establish and administer comprehensive programs for the custody, supervision, care, education, treatment, instruction, guid-

ance, control, and rehabilitation of all persons committed or admitted to the state facilities (RCW 72.05.130); contract for and provide standard educational services within the institutions (RCW 72.05.140); enter into contracts with private social agencies, political subdivisions, and other state agencies, or any agency of the federal government (RCW 72.05.160); transfer inmates from one facility to another, including the transfer of incorrigible juveniles over 16 years of age to the reformatory, with the notice and knowledge of the committing court (RCW 72.01.390, 72.05.130, 13.04.190, 200); and parole, place, and discharge inmates from custody with notice to and knowledge of the committing court (RCW 13.04.095, 72.05.130).

Against this broad background of policy, objectives, duties, and authorization, we arrive at a consideration of plaintiffs' allegations of negligent conduct on the part of the state. All revolve about, and in varying degrees involve, the legislative designation of the Green Hill School as a "close security" facility (RCW 72.05.130(4)),[3] and the history of the boy involved prior to April 2, 1962.

The first two contentions are that the state was negligent (1) in maintaining the "open program" at the Green Hill School, and/or (2) in assigning the boy in question to the "open program." In essence, it is plaintiffs' contention that one or both of these decisions would be tortious if found by a jury to be unwise, mistaken, negligent, or contrary to the "close security" designation.

We cannot agree.

In the first place, we do not conceive that by characterizing Green Hill School as a "close security" facility, the legislature thereby intended that the school become a maximum security or penal like institution, in which the inmates would be strictly confined and under constant surveillance. The legislature did not direct the erection of cell blocks, walls, and guard towers, nor order the employ-

[3]" . . . Green Hill school and Maple Lane school are hereby designated as 'close security' institutions to which shall be given the custody of children with the most serious behavior problems." RCW 72.05.130(4).

ment of armed guards. Instead, it directed that there be provided at such facility "that type of care, instruction, and treatment most likely to accomplish . . . rehabilitation and restoration to normal citizenship." (RCW 72.05-.010, *supra*.) Thus, it is clear that the legislature intended that Green Hill School constitute an intermediate facility, between the reformatory or a mental hospital on the one hand and minimum security facilities on the other, with internal treatment and security measures geared to the age, mental, and behavior capacities of the boys assigned to the institution and consistent with the objective of their return to society as useful citizens. Absent a more definitive legislative mandate as to security measures, discretion in the establishment and maintenance thereof was perforce vested in the agency responsible for carrying out basic policies and objectives.

In the second place, the establishment and maintenance of an overall and individual training and security program within a correctional facility such as Green Hill School, consistent with the adopted policy and objectives of the state's delinquent youth program, necessarily require that a proper balance be struck between therapy and security. To this end, it calls into play the exercise of executive expertise, evaluation and judgment in an area involving many variable human, emotional and psychological factors and about which widely divergent opinions can and do exist. The decisions required are not unlike those called for in the legislative and judicial processes of government. Indeed, we have held that an administrative decision to parole an inmate from a mental hospital embraces the exercise of discretion which is quasi-judicial in character. *Emery v. Littlejohn*, 83 Wash. 334, 145 Pac. 423 (1915). To now hold, under existing legislation, that the exercise of the executive and administrative discretion involved in plaintiffs' first two contentions is subject to regulation and control by the media of damage actions would do naught but stifle the basic governmental process and policy.

We conclude that, as applied to these contentions of plaintiffs, the four questions heretofore posed clearly and un-

equivocally demand affirmative answers. The decisions involved were, within the framework of necessary executive and administrative processes of government, purely discretionary, if not in fact quasi-judicial in character. Even though in the eyes of some the decisions involved may seem unwise, such does not render the state subject to orthodox tort liability.

We come then to plaintiffs' third and fourth contentions. They are that the state was negligent (3) in assigning the boy to the boiler room detail, and (4) in failing to timely notify local law enforcement agencies of his escape. Plaintiffs predicate their third contention upon the assertion that, under the evidence presented, the employees of Green Hill School knew or should have known of the boy's propensity for escape and for setting fires, and that by detailing him to the boiler room, a site close to the highway and a place where fires were maintained, such employees virtually set the stage for what ensued. Plaintiffs' fourth contention revolves about evidence to the effect that there was a delay beyond normal (the delay ranged from 2 minutes to 10 minutes over the normal 20 minutes) in notifying local law enforcement agencies of the escape.

Both contentions involve acts or omissions that can properly be characterized as "operational," "ministerial," or "housekeeping" functions, as opposed to policy decisions embracing the exercise of purely executive or administrative discretion. Though the acts may be said to involve some discretion in varying degrees, the acts primarily involve internal management functions, and do not involve decisions which are essential to the realization or attainment of the basic policies and objectives of the delinquent youth program of the state. If negligent performance of such functions proximately caused damage, the state would become subject to liability therefor under the provisions of RCW 4.92.090.

We can agree with counsel for both parties that, in the performance of such functions, the standard of care imposed upon the state in its treatment, management, and control of delinquent children committed to its custody

may be likened to that of parent to child. In effect, the legislature has so stated, for it has provided by RCW 13.04-.010 that children adjudged to be delinquent shall be considered wards of the state, and has indicated by RCW 13.04.140 that the care, custody, and discipline of such children shall approximate that which should be given by parents.

Both parties cite and rely upon the statement of the applicable theory as found in *Excelsior Ins. Co. of New York v. State of New York*, 296 N.Y. 40, 69 N.E. 2d 553 (1946), a case involving an escapee from a state school for mentally defectives. The court stated (p. 44):

Toward the inmate . . . , the State had a "quasi-parental power"—bound, Sir Frederick Pollock has observed, to use more diligence in informing itself what treatment was proper for him than a parent would be bound to use. (Pollock on Law of Torts [new American ed., 1894], pp. 150-151.) So far as third persons were concerned, though, the State stood *in loco parentis*. (Cf. Restatement, Torts, §§ 316-317.) The State owed the community, the outside world, no greater duty than would parents under similar circumstances. In the absence of reason indicating a need to isolate him, neither parent nor State is under the necessity of locking him up or keeping him under constant surveillance. (*Calabria v. State of New York*, 289 N.Y. 613.)

. . . . As Chief Judge Cardozo phrased it in *Palsgraf v. Long Island R.R. Co.* (248 N. Y. 339, 344): "The risk reasonably to be perceived defines the duty to be obeyed," and that test has, in principle, been consistently applied by the courts in determining whether to impose liability upon the State where injury befalls the patient who elopes from a public institution [Citing cases.] or a third person who is assaulted by an escaped inmate of a mental hospital [Citing cases.], or where property is damaged by such an inmate. [Citing case.]

We too, have recognized that the element of foreseeability must be present if the custodian of a committed person is to be held liable for his depredations while at large. *Emery v. Littlejohn, supra.*

Applying the rule then, as stated, to plaintiffs' third contention, we are unable to say from a careful review of the

record that, given the state's knowledge, observation, and experience with the boy prior to April 2, 1962, the average parent could or should have reasonably foreseen that assigning the boy to a detail, upon which he would be under the direct supervision of an adult, would precipitate his flight and the ensuing damage. In this respect, it is to be borne in mind that the boy, during the approximate 15 to 16 months he was at Green Hill School, had not attempted to escape, had not been diagnosed as a pyromaniac, had not given any significant indications of a proclivity for setting fires, and had been assigned on more than one occasion to the particular detail in question, as well as to other details with less supervision, all without incident. Against this background, we cannot say that on April 2, 1962, the state reasonably could or should have foreseen that the boy would run away and set fire to a house and a church. Reasonable foreseeability, rather than hindsight, is the criterion which must be applied.

We come finally, then, to plaintiffs' fourth contention. In this respect, the evidence indicated that the normal procedure following an escape was to notify local law enforcement officials within 20 minutes of the departure. The reason assigned was that early notification enhanced the prospects of apprehension. The evidence further indicated that, in the instant case, the agencies were notified within 20 to 30 minutes following the boy's escape. The record, however, is devoid of any evidence bearing upon what measures the respective agencies would and could have taken, and did not take, but for the short delay. Any causal relation, therefore, between the delay and the ensuing damage rests entirely upon speculation.

For the reasons heretofore stated, we conclude that the state's motions to dismiss made at the outset and during the course of trial should have been granted.

The judgment is accordingly reversed and plaintiffs' claims are dismissed.

ROSELLINI, C. J., HILL, DONWORTH, WEAVER, OTT, and HALE, JJ., concur.

FINLEY, J. (dissenting)—In my opinion, the majority engrafts upon RCW 4.92.090, the statute abolishing sovereign immunity in the state of Washington, the chimerical words, "discretionary act," ostensibly as a delimitation of the liability of the state for blameworthy, tortious conduct. Thus, compensation in legal damages in a court of law may be denied to citizens for injury and harm negligently inflicted by the state. The choice of language employed by the majority to reach this result and the result itself are, in my judgment, both unfortunate and unwarranted in view of *the language actually utilized by our state legislature in describing the ambit of the state's tort liability.*

The plaintiffs herein brought suit under the Laws of 1961, ch. 136, § 1, p. 1680 (RCW 4.92.090):

> The state of Washington, *whether acting in its governmental or proprietary capacity,* hereby consents to the maintaining of a suit or action against it for damages arising out of its tortious conduct to the same extent as if it were a private person or corporation. (Italics mine.)

That statute was amended by Laws of 1963, ch. 159, § 2, p. 753, and now provides:

> The state of Washington, *whether acting in its governmental or proprietary capacity,* shall be liable for damages arising out of its tortious conduct to the same extent as if it were a private person or corporation. (Italics mine.)

The 1963 amendment was apparently enacted in the light of widespread judicial unwillingness to sound the final death knell for the archaic concept of sovereign immunity:

> Judicial responsibility for sovereign irresponsibility in tort goes far beyond the original invention and elaboration of the immunity doctrine. Even when legislative bodies become convinced that tort plaintiffs should be allowed to sue the sovereign, and even when clear and unequivocal statutes are enacted authorizing such suits, the courts have characteristically nullified such legislation by interpreting it to mean that sovereign irresponsibility must continue!
>
> . . . .
>
> Commentators have pointed out that "enactment of statutes authorizing suits against the state or its sub-

divisions by all persons having claims against them has very little bearing upon tort liability or responsibility. In at least seventeen states there are or have been such enactments which have been interpreted as merely permitting the filing of suits or claims, but as having no effect upon the substantive right to collect such claims." 3 Davis, Administrative Law 455, 457 (1st ed. 1958)

To date, this court has not evinced judicial distaste for the clearly articulated legislative policy abolishing the doctrine of sovereign tort immunity in this state. *Kelso v. Tacoma,* 63 Wn.2d 913, 390 P.2d 2 (1964), and *Hosea v. Seattle,* 64 Wn.2d 678, 393 P.2d 967 (1964). The instant case is not particularly suited to break the consistency of this judicial record.

The following language of the majority opinion provides the springboard for the limitation of the statute subsequently arrived at by the majority:

> The statute, however, is not as broad as it possibly could have been written. Although it does not contain the varied exceptions found in the Federal Tort Claims Act . . . it does contain limitations. State government is rendered liable for damages only when such damages arise out of "tortious conduct to the same extent as if it were a private person or corporation."

I am hard put to find a limitation in the language quoted from the statute. Rather than belabor the point, I shall leave the problem of whether the language was meant to be "a limitation" to the semanticists and lexicographers. I am convinced of one fact. The legislature, in abolishing sovereign immunity in this state, has painted with the broadest possible brush. This influences my characterization of the language of the statute as being descriptive or expansive rather than limiting.

Having made the initial above-mentioned inroad upon the statute, the majority opinion in the following policy statement proceeds to engraft a potentially parasitical growth upon the language utilized by the legislature:

> Practically all jurisdictions that have broken varying amounts of ground in the abdication of governmental immunity from tort liability have *judicially,* if not statu-

torily, recognized that the legislative, judicial, and purely executive processes of government, including as well the essential quasi-legislative and quasi-judicial or discretionary acts and decisions within the framework of such processes, cannot and should not, from the standpoint of public policy and the maintenance of the integrity of our system of government, be characterized as tortious however unwise, unpopular, mistaken, or neglectful a particular decision or act might be.

. . . .

Recognizing the need and reason for a limitation on sovereign tort liability is one thing. Establishing guidelines for its application, however, is another matter, particularly in the area involving executive or administrative *discretion.* (Italics mine.)

The foregoing is the sine qua non of the majority's reasoning; namely, there must be a limitation on the abolition of sovereign immunity regardless of the difficulty of delineating the areas in which the state shall or shall not be liable. But the vehicle utilized by the majority in a judicial demarcation of sovereign liability's ending point, *i.e.,* "discretionary acts," was specifically rejected by the legislature. The statute reads that the state shall be liable *whether acting in its governmental or proprietary* capacity. It seems to me that there is little if any distinction to be made between the characterization of a municipal corporation's function as "governmental" or "proprietary" and the designation of a state agency's function as "ministerial" or "discretionary." The majority opinion cites *Dalehite v. United States,* 346 U.S. 15, 97 L. Ed. 1427, 73 Sup. Ct. 956 (1953), in its attempt to clarify the terms "ministerial" and "discretionary." In *Dalehite,* the court, with respect to the Federal Tort Claims Act, states that "it was not contemplated that the Government should be subject to liability arising from acts of a *governmental nature or function."* Whether or not it was warranted, this statement would seem to equate the terms "governmental" and "discretionary"—the latter of which is utilized by the Federal Tort Claims Act in excepting governmental conduct for which it shall not be subject to tort liability.

Our legislature did not utilize either the "governmental-proprietary" distinction or the "discretionary-ministerial" characterization in abrogating sovereign immunity. Instead, the statute reads that the state of Washington, *whether acting in a governmental or proprietary* manner, shall be liable for its tortious conduct *in the same manner as if it were a private person or corporation.* We may safely assume that the legislature was aware of the difficulties which abound in attempting to pigeonhole official conduct as governmental or proprietary, or as discretionary or ministerial. In drafting the statute, the legislature specifically negated the use of the first dichotomy and attempted to make orthodox tort law principles applicable to governmental conduct. Surely the legislature's exclusion of the *broad* term, "governmental," which encompasses a wide range of activity, can correctly be said to likewise exclude the *lesser* included term used by the majority, "discretionary."

In the case before us tort law principles would seem to indicate that the state is liable. The majority opinion correctly notes the rehabilitative policy implemented by our statutes with respect to delinquent and dependent children who are committed to the Department of Institutions in this state. But a corollary purpose or function of the Department of Institutions is to protect society from those children whose personality maladjustments—whatever the cause—are such that playmates, parents, other adults, and their property are placed in danger when in the proximity of the disturbed child. The *duty*, then, of the state is corrective and rehabilitative with respect to the child, but also protective with respect to society in a larger spectrum than is recognized or implemented by the majority.

The dismal history of this child can leave no doubt that he was in need of care; but, correlatively, *society needed protection from him.* He had set at least four fires in the past and had been unable to adjust to society upon his first release from Green Hill School. It is important to note that his return to that institution was coupled with a recommendation that he be classified as a security risk.

What should be the standard of conduct applicable to the state in this instance? If the boy escaped, was there not a foreseeable risk created to the persons and property with which he came into contact? The boy's past antisocial behavior, coupled with the fact that he had only recently been recommitted to Green Hill, should have put the personnel of that institution on notice that stringent security measures were required. I do not quarrel with the necessity of maintaining the so-called "open program" in order to implement the institution's rehabilitative function, but a balance must be struck; and here, the unreasonable risk of harm to society created by the boy's escape would seem to have necessitated tighter security measures.

Instead, the boy was placed on boiler room detail. This put him in a conveniently located area for escape. Among other questionable things, it seems to me at least a somewhat curious happenstance that a child who had previously set fire to other's property on not less than four known and separate occasions was given a work assignment in a boiler room. There, his exposure to the temptations of fire might test his resistance and upgrade his psychiatric classification; but the exposure also might again overstimulate the warped responses which previously and unequivocally characterized his psychotic personality. Any testing of his stability in this manner, if that was intended, was risky business, and it turned out to be just that for the plaintiffs in this lawsuit against the state. In the trial court the plaintiffs did not allege or attempt to prove the negligence of the particular employee who had only one child under his supervision at the time. Regardless of the particular circumstances which surrounded the boy's escape, the *inescapable* fact is that he was allowed to be in an area from which escape was relatively easy. This was the culpable act which created an unreasonable risk of harm to property and persons in the Chehalis area. Fortunately, the injury was to property only.

I would not propose making the state absolutely liable for the acts of those who escape from its custodial institutions. Rather, I choose to follow the *legislative guidelines*

*in applying only orthodox tort law to particular fact patterns.* Where there is a duty on the part of the state to protect society from unreasonable risk of harm, and there is a failure to measure up to that duty or standard of conduct, then I think the state should compensate those citizens who are injured by the acts of escaped convicts, mental patients, and juvenile wards, if those whose persons or property were injured were within the scope of the risk created by the negligent acts of the state in allowing them to escape.

The majority chooses to insert the virtually useless "discretionary-ministerial" distinction phrase, or glittering generality, into our statute. This, I think, is without semantical, logical or legal foundation. To me it offers no rationally acceptable solution of the instant case, and promises no definitive solutions in future cases involving application of the policy enacted by the legislative branch in abrogating sovereign immunity in the state of Washington. Limitation on this broad and significant change in social policy should now emanate from the legislative rather than the judicial branch.

For the reasons indicated herein, I dissent.

HUNTER, J., concurs with FINLEY, J.

---

January 18, 1966. Petition for rehearing denied.