ADAMOV *v.* THE STATE OF OHIO, OHIO YOUTH COMMISSION.

(No. 75-0303—Decided June 26, 1975.)

Court of Claims.

*Mr. Charles Thomas Crangle,* for plaintiff.
*Mr. William J. Brown,* attorney general, and *Mr. Steven L. Ball,* for defendants.

TROOP, J. This opinion is addressed to the motion of the Attorney General, filed on behalf of the state of Ohio,

May 14, 1975, asking for summary judgment favorable to the state. The date set for hearing on the motion was June 11, 1975, at which time the cause came on for consideration and disposition.

The complaint, filed April 17, 1975, by Gail M. Adamov, seeks to recover damages for personal injuries suffered as a result of an attack by one Carl Dwayne Harris, a minor. Details respecting the nature of the attack, which took place February 11, 1975, in the home of Mrs. Adamov, are set out in the complaint.

It is further alleged that Harris, as a delinquent, had been committed to the custody of the Ohio Youth Commission Center by the Juvenile Court of Summit County, and was, on February 11, 1975, on "released" status from that institution, but remained under the supervision of the Youth Commission.

Counsel for the claimant makes a clear statement of the theory upon which plaintiff relies for recovery in the allegations of the complaint. In paragraph 4, this proposition appears:

"The injuries suffered by the plaintiff were a direct and proximate and foreseeable result of the gross and flagrant violation of duty imposed upon the Ohio Youth Commission and its employees by Chapter 5139 of the Ohio Revised Code."

In paragraph 6 of the complaint, it is claimed that the expenses incurred by Mrs. Adamov, by reason of the injuries suffered, were "a further and proximate result of the aforesaid gross negligence and flagrant violation of a statutory and a common law duty * * *."

In paragraph 7, the claimant reiterates, and adds, that her injuries were not only the direct and proximate result, but also a "foreseeable result of the gross negligence and flagrant violation of statutory duty."

If there be a violation of a duty in this case, chargeable against the employees of the state of Ohio, as a basis of recovery, there must be shown to be a statutory duty. State agencies are directed by statutory provision and duties are defined and imposed by legislative enactment and not by common-law rule.

To complete the factual picture, it is necessary to note an affidavit, attached to the memorandum of the Attorney General in support of his motion for summary judgment. The affiant is Howard V. Ware, chief of the classification and assignment section of the Ohio Youth Commission. The facts recited in the affidavit are important to this discussion. The pertinent portion of the documents reads, as follows:

"1. That he is Chief of the Classification and Assignment Section of the Ohio Youth Commission and he is responsible for the administration of intake, transfer, release, and discharge, of youths committed to the custody of the Ohio Youth Commission.

"2. That he has carefully examined the records regarding the medical and psychiatric examinations of Carl Dwayne Harris, as well as the administrative records regarding his commitment to the Ohio Youth Commission.

"3. That Carl Dwayne Harris was committed to the permanent care and custody of the Ohio Youth Commission by the Juvenile Court of Summit County, Ohio on February 19, 1974.

"4. That a study was made of Carl Dwayne Harris after he was committed to the custody of the Ohio Youth Commission to assist in determining his course of rehabilitation.

"5. That Carl Dwayne Harris remained in institutional custody at the Training Institution of Central Ohio until November 12, 1974, the date of his release from physical custody on parole to his parents.

"6. That the Juvenile Court of Summit County, Ohio was notified of the release of Carl Dwayne Harris over 15 days prior to such release."

It is noted that this affidavit, in support of the motion for summary judgment, has been refuted by affidavits, attached to a memorandum contra, as is required by Civ. R. 56 (C) and (E).

It is established that Carl Dwayne Harris was committed to O. Y. C., February 19, 1974, and was released, on parole, to his parents, November 12, 1974, which was more than five months after his commitment. The Juvenile Court

of Summit County was notified of the contemplated release more than fifteen days before release occurred.

The plaintiff alleges that O. Y. C. and its employees violated applicable statutory requirements and duties. Those applicable statutes are examined in connection with that allegation.

Applicable law is not limited to that included in R. C. Chapter 5139. The chapter covering the Juvenile Court, R. C. 2151, is closely related. It is significant because procedures for dealing with juveniles begin there. R. C. 2151.01 is basic. It supplies the motivating philosophy and purpose for the enactment. The pertinent portions read as follows;

"The sections in Chapter 2151, of the Revised Code, with the exception of those sections providing for the criminal prosecution of adults, shall be liberally interpreted and construed so as to effectuate the following purposes;

"(A) To provide for the care, protection, and mental and physical development of children subject to Chapter 2151, of the Revised Code;

"(B) To protect the public interest in removing the consequences of criminal behavior and the taint of criminality from children committing delinquent acts and to substitute therefor a program of supervision, care, and rehabilitation;

"(C) To achieve the foregoing purposes, whenever possible, in a family environment, separating the child from its parents only when necessary for his welfare or in the interests of public safety;"

It should be noted that the Juvenile Court deals with the "child." A "child" is under 18 years of age, and any child who violates the law prior to 18 years is deemed a "child" at the time a complaint is filed, or hearing had, if under 18 years at the time the offense was committed. (R. C. 2151.011.)

R. C. 2151.355 provides how the court may make disposition of the offending child. One way is to "(D) Commit the child to the legal custody of the Ohio Youth Commission;"

Such disposition brings into focus the duties of the

commission. R. C. 5139.04 (C) is important to this discussion. It reads, as follows;

"The youth commission shall:

"(C) Receive custody of all children committed to the commission in accordance with Sections 2151.01 to 2151.99, inclusive, of the Revised Code; cause a study to be made of such individuals, and issue such orders for the treatment of each child as the commission considers best suited to the needs of the individual and the interest of the public;"

Of even more interest to this discussion is R. C. 5139.-06, which deals with what the commission may do with the child after its commitment. The entire section is of interest because it reflects the philosophy of the legislation providing a wide range of discretion to be exercised by those who are responsible for the child. R. C. 2151.01 defines the public interest in the delinquent child to be;

"* * * removing the consequences of criminal behavior and the taint of criminality from children committing delinquent acts and to substitute therefore a program of supervision, care, and rehabilitation."

To accomplish that objective, R. C. 5139.06 provides that:

"When a child has been committed to the Youth Commission it *may*:

"* * *

"(B) order his release on parole under such supervision as it believes conducive to law-abiding conduct; provided that fifteen days notice shall be given to the committing court prior to release on parole." (Emphasis added.)

In this instance, the O. Y. C. did precisely what the statute allows it to do, and did it in compliance with the limitations imposed. In releasing Carl Dwayne Harris to his parents, the commission responded to the direction in R. C. 2151.01 (C) to the effect that it, the commission, should accomplish rehabilitation of the child, and other purposes, "whenever possible, in a family environment, separating the child from its parents only when necessary for his welfare or in the interest of public safety."

When and how to act in determining the necessity of advancing the child's welfare, and at once protecting the public safety, falls within the discretion of the commission and its employees.

This original action, and others reflecting at least a hope that the state of Ohio, under R. C. Chapter 2743, will provide reimbursement for all kinds of unfortunate injuries and losses, raises difficult questions of interpretation of the new law.

The new law waiving the sovereign immunity of the state does encompass a broad base, but it is not without limitations, as is true of the court. of claims statutes in other jurisdictions. That the waiver does not extend to political subdivisions is clearly stated in R. C. 2743.01(A). Those areas "responsible for governmental activities" in geographical, areas smaller than the state still enjoy immunity. (R. C. 2743.01(B).)

. Equally significant is R. C. 2743.02, which waives the sovereign immunity, enjoyed in the state over many years, and then follows language, as follows: ·

"* * * and consents to be sued, and have its liability determined, * * * in accordance with the same rules of law applicable between private parties * * *."

At once, that provision suggests that the causes of action in which private parties are concerned are the kinds of causes in which there can be the possibility of recovery from the state by the citizens of the state. Private parties are involved in actions for breach of contract, orthodox tort liability and the commonly accepted equitable remedies.

Private parties do not. ordinarily operate prisons, patrol the highways, operate institutions for the mentally ill, at least not to the extent as does the state, provide welfare assistance for the unfortunate, and impoverished, nor do they license and regulate professional and business entities and. persons by an exercise of the police power of the state.

There is an area, even if not too definitively marked out, in which there must be room to govern. The Supreme Court of the state of Washington quotes from a decision of the United States Supreme Court, in *Evangelical United Breth-*

*ren Church of Adna* v. *Washington* (1965), 67 Wash. 2d 246, at page 253, "it is not a tort for government to govern."

This suggestion from the Supreme Court seems to have encouraged the very sweeping proposition which the Washington court incorporated in the second paragraph of the syllabus to the decision in the *Evangelical United Brethern Church* case. It reads, as follows;

"While RCW 4.92.090 has abolished sovereign immunity from tort liability, the legislative, judicial, and purely executive processes of government, including as well the essential quasi-legislative, quasi-judicial or discretionary acts and decisions within the framework of such processes, cannot be characterized as tortious however negligent, since in any organized society there must be room for basic governmental policy decision and implementation, unhampered by the threat of sovereign tort liability."

A frequently suggested test to assist in defining the area in which government may govern is whether the governmental officer or agency, etc., the state in our case, is endowed with statutory power to exercise discretion. Legislatures frequently speak broadly as to the purpose or objective of a given statute and as to the accomplishment of that purpose provide what the administrative officer "may" do. R. C. Chapter 5139 falls within that category.

The state of Washington had essentially the same waiver provisions in its court of claims act as does Ohio. It waived its immunity as to its tortious acts to the same extent as if it were a private person or corporation. Their arrangements for the care, custody, and rehabilitation of delinquent children are similar to that in Ohio. A 14-year-old boy, assigned to work with an adult in the school boiler room, walked away from the facility and before he was apprehended set fire to the church building and a private home, causing the complete destruction of the buildings.

The church and homeowner claimed that the state was negligent in operating the school with only minimal security measures as to the boy when it knew, or should have known, the boy had a propensity for incendiarism and was a pyromaniac. It was true that the boy had set other fires and exhibited other anti-social behavior. He had not been sub-

ject to maximum security measures and had been assigned to the boiler room as a part of the rehabilitation program of the school.

The O. Y. C., as did the management of the Green Hill School in the *Church* case, had a duty to attempt to rehabilitate Carl Dwayne Harris, imposed by statute in response to the legislatively-announced policy (R. C. 2151.01) to accomplish such rehabilitation ''in a family environment.''

There is no gross and flagrant violation of a duty imposed by statute upon O. Y. C. in the release of Carl Dwayne Harris. The O. Y. C. personnel released the child to his parents only after having kept him the required time and having furnished the required notice. These facts are undisputed. If the release appeared to be unwise in the light of later developments, such does not impugn the exercise of discretion by the O. Y. C. staff.

To draw lines between the wise and the unwise when the choice lies between one of two announced statutory objectives is most difficult. Especially so when the choice lies between, in this case, ''rehabilitation'' of the boy, by making him a part of his ''family environment,'' and ''the interests of public safety.''

The exercise of discretion is frequently the subject of judicial discussion. It is a troublesome term. It belongs to an administrative, or executive, governmental official. Usually, to qualify as a valid exercise, the decision must relate to a basic governmental policy or objective. It must be essential to the attainment of that objective. And as well, it must involve evaluation and judgment based upon expertise and be grounded upon requisite statutory authority and a duty to make a decision.

The release of Harris responds favorably to these requirements. That authority to exercise discretion is necessary for government to govern is generally accepted in decision law. The matter of discretion in the area of government is continually a troublesome matter.

The federal government disposed of the troublesome matter of discretionary authority in the enactment of the federal claims law. Section 2680, Title 28, U. S. Code, titled ''Exceptions,'' reads, as follows:

"The provisions of this chapter and section 1346(b) of this title shall not apply to:

"(a) Any claim based upon an act or omission of an employee of the government, exercising due care in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the government, whether or not the discretion involved be abused."

The General Assembly did not choose to include such a provision in Ohio law. It is not included in the laws of other jurisdictions, i. e., Washington and New York. Nonetheless, the principle expressed in the federal law is valid. It is approved by decision law in other states. It expresses a necessary conclusion when in the presence of a statute, permissive in nature, with a "may" format, and absent any positive requirement that can be found to have been violated.

Incidents such as are called to the attention of this court by the recital of injuries to Mrs. Adamov, inflicted by a delinquent boy, are numerous. Courts in other jurisdictions, as does this court, find the incidents deplorable and the problems presented overwhelming. The Washington Supreme Court, in the *Evangelical Church* decision, calls attention to a New York decision worthy of noting. In *Excelsior Ins. Co. of N. Y.* v. *New York* (1946), 296 N. Y. 40, the court gave attention to an 18-year-old "moron" who ran away from a state school. He entered an unlocked barn and sought relief from sub-zero weather by kindling a fire. Having warmed himself, the lad put a bucket over the fire and continued his flight. The fire blazed and spread and a destructive fire ensued.

The insurance company said the state was negligent, but, following trial, the court of claims dismissed the complaint holding that the state could not have reasonably anticipated such fire. The Appellate Division of the Supreme Court reversed the court of claims, but the New York Court of Appeals reversed the Appellate Division and affirmed the court of claims.

The reviewing court noted the troublesome problem presented in these cases and suggested that a balance must be struck between the duty of a state to care for the mentally defective, with an eye toward returning them to society as useful citizens, and the state's concern that inmates cause no injuries or damages to the persons or property of those in the vicinity.

That the "balance" sought was difficult to attain was readily admitted by the court and perhaps motivated the thought that it was necessary for courts to keep within well settled principles in reaching conclusions regarding that balance.

The New York court generalized saying a state was held only to a duty of taking precautions against those risks "reasonably to be anticipated." The court went on to discuss the proposition that the function of a state paralleled that of a parent as respects reasonable anticipation. The "loco parentis" concept gave rise to the court's syllabus, paragraph two, which reads as follows;

The court observed also, paragraph three of the head-notes that when it appears from the complaint that the injury is too remote to be referred to as the proximate cause of the injury no cause of action is stated.

A New York case, *Scochemaro, Admr.,* v. *New York* (1957), 165 N. Y. Supp. 2d 609, concerns a court of claims decision, about a 14-year-old youth who shot a 16-year-old youth, in which the court held that the evidence was insufficient to show negligence "or that absence of youth from school was causally connected with or proximate cause of death of decedent."

A decision of the Sixth Circuit United States Court of Appeals, *Estate of Burks* v. *Ross* (1971), 438 F. 2d 230, takes a slightly different turn resorting to "settled principles" bottoming its decision on the doctrine of executive privilege. A disturbed patient in a veterans hospital escaped and was killed by a train. The reviewing court held that the doctor-director, administrators, and psychiatrist of the hospital had absolute immunity on the doctrine, but returned the cause to the trial court to determine if there was

personal liability for negligence of those who took orders and performed ministerial duties under supervision.

The natural and probable consequence "settled principle" was respected in a recent New York decision. In *Dunn* v. *New York* (1971), 29 N. Y. 2d 313, the plaintiff's intestate was killed in an automobile collision with a car stolen by an escapee from a state hospital. Negligence in permitting the escape was alleged. The court cited the decision in *Excelsior Insurance, supra,* and held that if there were negligence there was an intervening cause, a proximate cause, of the death of the decedent. The state police, pursuing the escapee at the time of the accident, were held not to be acting unreasonably.

It cannot be said that there was a gross or flagrant violation of a statutory duty imposed upon O. Y. C. The exercise of discretion, permitted by statute, pursuant to the statutorily announced objective, is not negligence. And even if it were so regarded as to the injury to Mrs. Adamov, it cannot be said that the release of Harris, on parole to his parents, was the natural and probable consequence.

In some of the cases reviewed in the course of this discussion, there had been a trial of the cause. In the Washington decision, *Evangelical Church, supra,* the cause had been fully tried, but the Supreme Court reversed the judgment and dismissed the complaint after concluding that the state's motion to dismiss made at the outset, and during the course of the trial, should have been granted. That seems to say that dismissal should have been granted as a matter of law. That position, this court believes, is correct and should be followed.

The affidavits attached to the memorandum of counsel, opposing the motion for summary judgment, in no sense contravene the affidavits in support of the motion for summary judgment.

For these reasons, the defendant state of Ohio is entitled to judgment as a matter of law.

The motion for summary judgment is sustained and the complaint is dismissed.

*Complaint dismissed.*