HARRIS *v*. THE STATE OF OHIO ET AL.

(No. 75-0553—Decided January 20, 1976.)

Court of Claims.

*Mr. Jerome Leiken,* for plaintiff.
*Mr. Gene W. Holliker,* for defendant.

TROOP, J. A complaint was filed in this court, November 6, 1975, by Gordon Harris against the state of Ohio, Department of Mental Health and Mental Retardation. The allegations of the complaint which provide a background for the incident which is the basis for the complaint are of more than ordinary importance to this discussion and are quoted in full, as follows:

"(1) In 1972, Chester Holt, a female person, was a patient at the Cleveland State Hospital, a facility then owned and operated by the defendant, State of Ohio, through its agency, defendant, Department of Mental Health and Retardation.

"(2) In late 1972 or early 1973, said Chester Holt was, despite objections by her family, discharged from said hospital and continued treatment at several facilities owned and operated by the State of Ohio, as an out-patient.

"(3) While in the custody of the defendant, Department of Mental Health and Retardation, said Chester Holt demonstrated violent tendencies and the defendants knew or in the exercise of ordinary care should have known that said Chester Holt, would, if allowed her freedom, be a danger to the public, and in releasing said Chester Holt from custody, said defendants violated a duty to the public to protect them from such hazards, including the plaintiff, Gordon Harris."

The complaint alleges (paragraph 4) that on or about June 6, 1975, Chester Holt feloniously assaulted the plaintiff, Gordon Harris, "shooting him seven times" with a 22-caliber revolver, the shooting being the cause of the injuries about which plaintiff complains. Plaintiff says that Chester Holt is presently an inmate of Lima State Hospital for the Criminally Insane.

By appropriate motion, filed December 4, 1975, the Attorney General asks this court to dismiss the complaint of Gordon Harris for failure to state a claim upon which relief can be granted.

The argument developed by the Attorney General in support of his motion centers about the plaintiff's allegation that defendants knew or "in the exercise of ordinary care should have known that said Chester Holt would, if allowed her freedom, be a danger to the public * * *."

Briefly stated, plaintiff claims that the defendant, State of Ohio, Cleveland State Hospital, was negligent and thereby violated a duty to the public.

If the argument of the Attorney General in support of defendant's position can be stated briefly, it is that as a matter of law the defendants cannot be regarded as negligent and such claim is not well taken.

At the outset of this discussion of the problems raised by the motion of the Attorney General, R. C. 2743.02(A) must be noted. The language of the section is significant. It reads as follows:

"The state hereby waives its immunity from liability and consents to be sued, and have its liability determined, in the court of claims created in this chapter in accordance with the same rules of law applicable to suits between

private parties, subject to the limitations set forth in this chapter."

At once, that provision suggests that the causes of action in which private parties are concerned are the kinds of causes in which there can be the possibility of recovery from the state by the citizens of the state. Private parties are customarily involved in actions for breach of contract, orthodox tort liability matters, and the commonly accepted equitable remedies.

Private parties do not ordinarily operate: prisons, institutions for the mentally ill or insane, institutions for the mentally retarded or institutions for the criminally insane. Nor do private persons patrol the highways, provide welfare assistance for the unfortunate and the impoverished. Further, private persons do not license and regulate professional and business entities and persons by an exercise of the police power of the state.

A careful reading of R. C. 2743.02(A) suggests that there must an area, even if not too definitely marked out, where the rules applicable to the suits between private persons are inadequate and do not provide sufficient breadth to encompass the problems which arise incident to the functioning of government. Rules adequate as to private persons or private entities frequently do not provide room for government to govern.

This court has discussed at length the problem of giving government room to govern in at least two prior decisions. The first was a decision in *Adamov* v. *State*, Case No. 75-0303, released June 26, 1975 (46 Ohio Misc. 1), and second is *Mawhirter* v. *Department of Rehabilitation*, Case No. 75-0122, issued September 24, 1975.

The *Adamov* and *Mawhirter* decisions are in point since both involve the release of persons confined in state institutions. In *Adamov* a juvenile delinquent attacked a woman after his release on parole to his parents by order of the Ohio Youth Commission, and while still under the commissions control. In *Mawhirter* two convicted murderers had been released to attend the Ohio State Fair under a program permitting furloughs, as provided in R. C. 2967.27, arranged by the Department of Re-

habilitation. The walk-aways engaged a taxicab and on the way to Dayton stopped and assaulted the driver and stole his cab.

The suggested parallel in this case is that Chester Holt was released while a patient at the Cleveland State Hospital. Whether she was there for treatment on a voluntary or an involuntary basis is not alleged. The status of her commitment is of no consequence because release is available in either case. She had been released two years or more at the time of the incident, and it is alleged, received outpatient care during the period.

In the *Adamov* decision this court noted the social philosophy evident in the statutes dealing with "the child" offender. An underlying purpose to rehabilitate a minor is evident. (R. C. 2151.01.) The basic social purposes appear several times in the applicable statutes. Release for a child committed to the Ohio Youth Commission is provided in R. C. 5139.06. The section provides that:

"When a child has been committed to the youth commission it may:

"(B) Order his release on parole under such supervision and conditions as it believes conducive to law-abiding conduct; provided that fifteen days notice shall be given to the committing court prior to release on parole; * * *."

In the *Adamov* incident the OYC did precisely what the statute allowed and encouraged it to do. The commission complied with every requirement and at the same time responded to the statutory directive to attempt to accomplish rehabilitation of the child:

"whenever possible, in a family environment, separating the child from its parents only when necessary for his welfare or in the interest of public safety."

This Court, in *Adamov*, concluded that the OYC decision regarding when and how to act in meeting the requirement to advance the child's welfare and rehabilitation, and its simultaneous decision to decide on the matter of protecting the public safety, required the exercise of its lawful discretion.

Such an exercise of discretion, no abuse thereof having been claimed or shown, is not negligence.

In the *Mawhirter* decision, which deals with an en-

tirely different type of inmate, the court points out that the permission granted Williams and Hall, the walk-aways, to go to the Ohio State Fair was a part of a program authorized by R. C. 2967.27. The pertinent portion of the section reads as follows:

"(A) The department of rehabilitation and correction may grant furloughs to trustworthy prisoners confined in any state penal, reformatory, or other facility for the custody and rehabilitation of persons convicted of crime. Such furloughs may be authorized for the purpose of:

"* * *

"(7) Otherwise aiding in the rehabilitation of the inmate."

Certainly, the determination which inmates are trustworthy requires an exercise of discretion. To make such selection, absent any abuse of discretion, as authorized by a statute, is not negligence.

This case presents a parallel pattern to that in *Adamov* and in *Mawhirter*. In this case, Chester Holt was released from a state hospital.

The Department of Mental Health and Mental Rehabilitation has basic responsibility for the operation of the institution with which this decision is concerned. R. C. Chapter 5119 provides the basic law.

The necessity for the department to release persons held in the institution is made clear by the provisions of R. C. 5119.14. It is clear that in order to protect those not insane, authority to release must rest in the hands of some employee of the state. A portion of R. C. 5119.14 makes that point. That portion reads as follows:

"The department of mental *health and mental retardation* may examine into, with or without expert assistance, the question of the sanity or condition of any person committed to or confined in any hospital or asylum for the insane, or restrained of his liberty at any place within this state by reason of alleged insanity and may order and compel the discharge of any such person who shall not be insane and direct what disposition shall be made of him." (Emphasis added.)

R. C. 5119.56, which incidentally requires that the section be liberally construed, announces a basic objective

of the department to be the development of conditions:

"that will restore the largest possible portion of *the dependent wards of the state* to useful citizenship." (Emphasis added.)

Specific provision for the hospitalization of the mentally ill is found in R. C. Chapter 5122. Provision for trial visits at the discretion of the "head of a hospital" is made possible. There are no limitations in voluntary admittance cases but there are some restrictions where admission has been by judicial order. The introductory portion of R. C. 5122.23, reads as follows:

"When the head of a hospital deems it in the best interest of a patient, he may permit such patient to leave the institution on a trial visit, for such period of time and under such conditions as are proper and in the best interest of the patient and the public welfare."

R. C. 5122.21 speaks even more specifically as respects the release of those involuntarily admitted, as follows:

"The head of a hospital shall as frequently as practicable examine or cause to be examined every patient and whenever he determines that the conditions justifying involuntary hospitalization no longer obtain, discharge the patient not under indictment or conviction for crime and immediately make a report thereof to the division of mental *health.*" (Emphasis added.)

The commitment of offenders and the hospitalization of the mentally retarded is the subject of R. C. Chapter 5125. Here again R. C. 5125.10 provides for trial visits and discharge for the criminally insane, the psychopathic, and the retarded offenders. The superintendent of the state hospital and the responsible director:

"may place on trial visit or, upon the recommendation of the superintendent and approval of the *appropriate chief*, may discharge an inmate not under sentence or conviction for crime, who, in the superintendent's judgment, is recovered, or who has not recovered, but whose condition has improved to such extent that his discharge will not be detrimental to the public welfare or injurious to such inmate." (Emphasis added.)

The exercise of discretion is not only granted but required by statute.

These statutes concerned with the mentally ill are the counterpart of R. C. 5139.05 and 5139.06, which prescribe the duties and the powers of the Ohio Youth Commission and prescribe its disposition of the "child" committed to it. The discretion of the OYC is the point of concern in this Court's decision in *Adamov, supra. Adamov* influenced the decision in *Mawhirter,* the court having adopted and followed the *Adamov* decision. Attention is directed to those two decisions which provide the basic principles controlling in this case. These decisions also provide the reasons which require a similar conclusion in the instant case.

A starting point in a discussion about the exercise of discretion by public agents, or employees, is found in the Court of Claims Act, R. C. 2743.02 as quoted *ante.* This section waives the long standing sovereign immunity of the state, consents to be sued:

"and have its liability determined in the court of claims created in this chapter in accordance with the same rules of law applicable to suits between private parties, subject to the limitations set forth in this chapter."

As to this section, Judge Baynes, in the *Mawhirter* decision, at page two, speaks as follows:

"The genesis of this newly created right appears reasonably to relate to vesting of jurisdiction as well as procedure. Applying the same rules applicable between individuals relates to justiciable causes of action. In other words the discretion to govern never heretofore, nor does it now, give rise to a cause of action between individuals. If it does not as between individuals, it does not as between the individuals and the government. The Claims Act created no new causes of action where none had previously existed. It merely created a forum, *i. e.* a place to adjudicate the right of action."

The exercise of discretion is frequently the subject of judicial discussion. It is a troublesome term. It belongs to an administrative, or executive, governmental official. Usually, to qualify as a valid exercise of discretion the decision must relate to a basic governmental policy or objective and it must be essential to the attainment of that objective. Further, the decision must involve evaluation

and judgment based upon expertise and be grounded upon requisite statutory authority and duty.

Some states take care of this troublesome matter by legislative enactment. The federal government disposed of the matter of the exercise of discretion in the enactment of the Federal Tort Claims Act. Section 2680, Title 28, U. S. Code, titled "Exceptions," reads, as follows:

"The provisions of this chapter and section 1346(b) of this title shall not apply to:

"(a) Any claim based upon an act or omission of an employee of the government, exercising due care in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the government, whether or not the discretion involved be abused."

The General Assembly did not chose to include such a provision in Ohio law. It is not included in the laws of other jurisdictions, e. g., Washington and New York. Nevertheless, the principle expressed in the Federal law is valid. It is approved by decision law in other states. It expresses the necessary conclusion that when in the presence of a statute, directive or permissive, in nature, and absent any positive requirement that can be found to have been violated, the exercise of discretion does not give rise to a right or cause of action.

Other jurisdictions have faced the matter of the exercise of discretion in government and have ruled squarely upon the matter. The state of Washington can rely upon the unequivocal decision of its Supreme Court in *Evangelical United Brethren Church of Adna* v. *Washington* (1965), 67 Wash. 2d 246, in which the Washington court quotes with approval the statement of the United States Supreme Court that:

"it is not a tort for government to govern. [67 Wash. 2d 246 at 253]"

This suggestion from the U. S. Supreme Court seems to have encouraged the very sweeping proposition which the Washington Court incorporated in the second para-

graph of the syllabus to the decision in the *Evangelical United Brethren Church* case. The syllabus reads:

"While RCW 4.92.090 has abolished sovereign immunity from tort liability, the legislative, judicial, and purely executive process of government, including as well the essential quasi-legislative, quasi-judicial or discretionary acts and decisions within the framework of such processes, cannot be characterized as tortious however negligent, since in any organized society there must be room for basic governmental policy decision and implementation, unhampered by the threat of sovereign tort liability."

The very disturbing problem presented in this case and similar cases cannot be overlooked. The problem is suggested by plaintiff's counsel when he pleads, in paragraph 3 of the complaint, that the state of Ohio, "violated a duty to the public to protect them [the public] from such hazards" as resulted from the release of Chester Holt.

A New York court in *Excelsior Ins. Co.* v. *New York* (1946), 296 N. Y. 40, suggested that a balance must be struck between the duty of a state to care for the mentally defective, with an eye toward returning them to society as useful citizens, and the state's concern that inmates cause no injuries or damages to the persons or property of those in the vicinity.

Courts appear ready to admit that the "balance" to be sought is overwhelmingly difficult to attain. In the presence of the necessity of reaching conclusions supporting the exercise of discretion, especially in the area of the release of inmates from mental institutions, courts have resorted to the use of many standard doctrines to reach that necessary "balance."

One suggestion is that states may be held to a duty to protect against only such risks which are "reasonably to be anticipated." In this case Holt was at large, even if subject to out-patient care, for a period of approximately two years before the injury to Harris. The query is—Was the act reasonably to have been anticipated?

The long standing doctrine that a person or entity is responsible for the natural and probable consequence of his, of its, actions is commonly applied to deny the liability

of a state. Courts refuse to accept the *"loco parentis"* concept as creating liability for the state as respects care of the mentally defective.

Courts in jurisdictions which have claims statutes similar to the Ohio statutes uniformly rely on the presence of a discretionary statutory function, and an exercise thereof within its prescribed limits, to establish the conclusion that there was no actionable negligence to support the claims against the state.

Chester Holt was released from Cleveland State Hospital as a result of the exercise of discretion as authorized by statute. Certainly the injury to Harris was not the natural and probable consequence of that release. Nor could the injury to Harris, more than two years after the release, have been reasonably anticipated.

It is appropriate to say that generally speaking, the Legislature has waived state sovereignty only in those cases common to individuals and the normal subject matter of individual causes of action. If the present Court of Claims Act were intended to enlarge the liability of the state of Ohio so as to cover injury to a citizen resulting from the exercise of a governmental power prescribed by a statute such enlargement must be shown by an unmistakable statute, regularly enacted by the General Assembly.

The Court of Claims Act, provides the citizen a new substantive right, the right to sue the state of Ohio. The Act in so doing speaks in contravention of the common law, sovereign immunity being a common law concept, and must, therefore, be strictly construed. The courts of foreign jurisdictions having courts of claims, uniformly hold that a statute in derogation of sovereign immunity must be strictly construed. Typical of such decisions is that in *Dembrod* v. *State* (1945), 58 N. Y. S. 2d 490.

There must be room for government to govern.

For the reasons advanced the motion of the Attorney General asking that the complaint filed herein be dismissed is found to be well taken and therefore it is sustained.

The complaint is dismissed.