426 So.2d 996 (1983)
Azor J. EVERTON, Jr., Appellant,
v.
Marion WILLARD, Individually and d/b/a Willard's Painting Company, Pinellas County Sheriff's Department and Pinellas County, Appellees.
Anton TRINKO, Personal Representative of the Estate of Renee Trinko, Deceased, for the Use and Benefit of Anton Trinko and Phyllis Trinko, Appellant,
v.
Marion R. WILLARD, Individually and D/B/a Willard Painting, State Automobile Mutual Insurance Company, Deputy C.W. Parker, Pinellas County Sheriff's Department and Pinellas County, Appellees.
Nos. 81-2081, 81-2085.
District Court of Appeal of Florida, Second District.
January 5, 1983.
Rehearing Denied February 21, 1983.
*997 Rick A. Mattson of Mattson & McGrady, P.A., St. Petersburg, for appellant, Everton.
Joel P. Yanchuck and David Young of Yanchuck, Thompson & Young, P.A., St. Petersburg, for appellant, Trinko.
James B. Thompson of Fowler, White, Gillen, Boggs, Villareal & Banker, P.A., St. Petersburg, for appellees, Deputy Parker and Pinellas County Sheriff's Dept.
CAMPBELL, Judge.
This is an appeal from the dismissal of the counts of appellants' complaints that sought damages in tort from C.W. Parker, a Pinellas County sheriff's deputy, the Pinellas County Sheriff's Department, and Pinellas County. The separate complaints were consolidated below and remain so on appeal.
The consolidated complaints present us with the issue of the scope of the sovereign immunity of those agencies for the actions of a deputy sheriff acting within the scope of his employment in exercising his discretion of whether or not to take an individual into custody. This issue is created by the application and interpretation of section 768.28, Florida Statutes (1979), and Commercial Carrier Corp. v. Indian River County, *998 371 So.2d 1010 (Fla. 1979), and its progeny.
The facts as they must be accepted for purposes of appellees' motions to dismiss are that Azor Everton was seriously injured and Anton Trinko's daughter Renee was killed in a two car collision at an intersection in Pinellas County in the early morning hours of June 22, 1979. Renee Trinko was the driver and Everton was a passenger in one of the vehicles, while Marion Willard drove the second vehicle. Approximately ten to twenty minutes before the accident, Pinellas County Sheriff's Deputy C.W. Parker stopped Willard and issued him a traffic citation or summons for making an improper U-turn at another intersection. While issuing the citation to Willard, Deputy Parker knew, by his own observations and by Willard's own admissions, that Willard had been drinking to some extent. However, Deputy Parker did not charge Willard with a driving offense related to intoxication but instead, having issued the citation and having observed him while doing so, Parker allowed Willard to drive away. Appellants allege that by allowing Mr. Willard to proceed without detaining or arresting him for intoxication, Deputy Parker violated a duty owed to them in particular and to the public in general. They further allege that this violation resulted in the subsequent collision causing the death of Renee Trinko and the injuries to Azor Everton.
The trial court granted appellees' motions to dismiss, explaining:
The motion to dismiss was granted because the law enforcement officer must be allowed the freedom to exercise his discretion, a discretion to enforce which lies at the very heart of the policy of law enforcement, without being subject to suit in tort if his decision in retrospect results in misfortune to innocent third parties.
We first observe that only Trinko's complaint seeks to hold Deputy Parker liable in tort for actions allegedly committed within the scope of his employment as a deputy sheriff. Section 768.28(9)(a), Florida Statutes (1979), protects such an officer from being personally liable or from being named as a party defendant unless the officer acted in bad faith, with malicious intent, or in a manner exhibiting wanton and willful disregard of human rights, safety, or property. Appellant Trinko's complaint contains no such allegations regarding Deputy Parker and those counts of the complaint seeking damages from him should have been dismissed pursuant to section 768.28(9)(a).
If it were not for the subsequent enactment of section 768.28, Florida Statutes (1973), and the resulting decision in Commercial Carrier, we could simply affirm on the basis of Evett v. City of Inverness, 224 So.2d 365 (Fla. 2d DCA 1969), for the factual situations are amazingly similar. This court there found the City of Inverness not liable for the actions of its police officer on the "general duty"  "special duty" doctrine of Modlin v. City of Miami Beach, 201 So.2d 70 (Fla. 1967), because Modlin required a "special duty" to the injured party. This required the Evett court to affirm the dismissal of the complaint against the City of Inverness because any duty of the city's police officer was owed to the public in general and not specifically to the plaintiff in that case. However, in Commercial Carrier our supreme court has held that the subsequent enactment of section 768.28 abolished the Modlin "general duty"  "special duty" doctrine as it affects governmental immunity. Appellees argue, nevertheless, that even absent the Modlin doctrine they are immune from a tort action under the facts alleged by appellants because Deputy Parker's actions came within the discretionary function exception set forth in the four-pronged test of Evangelical United Brethren Church of Adna v. State, 67 Wash.2d 246, 407 P.2d 440 (1965), as adopted by our supreme court in Commercial Carrier. The problem with appellees' position is that while adopting the discretionary function test of Evangelical, our supreme court also adopted the "planning" versus "operational" test of Johnson v. State, 69 Cal.2d 782, 73 Cal. Rptr. 240, 447 P.2d 352 (1968). Clearly, whether discretionary or *999 not, Deputy Parker's acts were in the operational field of law enforcement for Pinellas County.
The Evangelical test adopted in Commercial Carrier is as follows:
Whatever the suitable characterization or label might be, it would appear that any determination of a line of demarcation between truly discretionary and other executive and administrative processes, so far as susceptibility to potential sovereign tort liability be concerned, would necessitate a posing of at least the following four preliminary questions: (1) Does the challenged act, omission, or decision necessarily involve a basic governmental policy, program, or objective? (2) Is the questioned act, omission, or decision essential to the realization or accomplishment of that policy, program, or objective as opposed to one which would not change the course or direction of the policy, program or objective? (3) Does the act, omission, or decision require the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved? (4) Does the governmental agency involved possess the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act, omission, or decision? If these preliminary questions can be clearly and unequivocally answered in the affirmative, then the challenged act, omission, or decision can, with a reasonable degree of assurance, be classified as a discretionary governmental process and nontortious, regardless of its unwisdom. If, however, one or more of the questions call for or suggest a negative answer, then further inquiry may well become necessary, depending upon the facts and circumstances involved.
371 So.2d at 1019, citing 407 P.2d at 445. The Johnson test also adopted in Commercial Carrier is as follows:
We recognize that this interpretation of the term "discretionary" presents some difficulties. For example, problems arise in attempting to translate this concern for the court's role in the governmental structure into an applicable touchstone for decision. Our proposed distinction, sometimes described as that between the "planning" and "operational" levels of decision-making (cf. Dalehite v. United States, supra, 346 U.S. 15, 35-36, 73 S.Ct. 956, [967-68, 97 L.Ed. 1427]), however, offers some basic guideposts, although it certainly presents no panacea. Admittedly, our interpretation will necessitate delicate decisions; the very process of ascertaining whether an official determination rises to the level of insulation from judicial review requires sensitivity to the considerations that enter into it and an appreciation of the limitations on the court's ability to reexamine it. Despite these potential drawbacks, however, our approach possesses the dispositive virtue of concentrating on the reasons for granting immunity to the governmental entity. It requires us to find and isolate those areas of quasi-legislative policymaking which are sufficiently sensitive to justify a blanket rule that courts will not entertain a tort action alleging that careless conduct contributed to the governmental decision.
371 So.2d at 1021, citing 73 Cal. Rptr. at 248-49, 447 P.2d at 360-61 (footnote omitted).
Before specifically analyzing the facts here in relation to those tests, we will reflect briefly on the history of the sovereign immunity problem that paradoxically seems to become more tangled each time the courts attempt to untangle it. Perhaps it is time, even past time, for the issue to be definitively and specifically addressed by the legislature so that the state, its agencies and subdivisions, can, with some degree of certainty, know the extent of their liability and guard against it. It is evident that they cannot now be certain when the courts themselves obviously continue to be uncertain as to the present extent of sovereign immunity, especially as each case and each factual situation seems to produce a new "test." It does not to us seem fair to drift toward the practice of allowing more and more cases to proceed to a jury determination *1000 on the question of what is "operational" or "planning" or what is "discretionary" or "nondiscretionary." The danger that lies in such practice, other than the obvious one of increasingly larger jury verdicts, is that there are some functions of government that are so peculiar to the act of governing that a jury is ill-equipped to make an informed decision.
In Commercial Carrier, the court well analyzed the progress of the law of sovereign immunity in this state to its present status. Under the early cases such as Kaufman v. City of Tallahassee, 84 Fla. 634, 94 So. 697 (1922), the appellees here would clearly be immune as Deputy Parker was functioning within the scope of his employment in a pure governmental function as opposed to a proprietary function. However, as the progress of the law of sovereign immunity developed, that became less clear. Under the limitations on sovereign immunity that existed after Hargrove v. Town of Cocoa Beach, 96 So.2d 130 (Fla. 1957), we believe that immunity would still have existed. The "cornerstone" language of Hargrove is:
We therefore now recede from our prior decisions which hold that a municipal corporation is immune from liability for the torts of police officers. Affirmatively we hold that a municipal corporation may be held liable for the torts of police officers under the doctrine of respondeat superior. We think it advisable to protect our conclusion against any interpretation that would impose liability on the municipality in the exercise of legislative or judicial, or quasi-legislative or quasi-judicial, functions as illustrated in such cases as Elrod v. City of Daytona Beach, 132 Fla. 24, 180 So. 378, 118 A.L.R. 1049; and Akin v. City of Miami, Fla. 1953, 65 So.2d 54.
Subject to the limitations above announced, we here merely hold that when an individual suffers a direct, personal injury proximately caused by the negligence of a municipal employee while acting within the scope of his employment, the injured individual is entitled to redress for the wrong... .
96 So.2d at 133 (footnote omitted). Our conclusion that immunity would exist under Hargrove is based on the key words "direct, personal injury proximately caused." Id. at 133 (emphasis added). Our conclusion is supported by the later decision in Modlin which refined the Hargrove decision by embracing the "special duty" doctrine necessary to impose liability.
In City of Tampa v. Davis, 226 So.2d 450 (Fla. 2d DCA 1969), this court wrestled with the Hargrove and Modlin doctrines, especially as they related to the earlier decisions of this court in Evanoff v. City of St. Petersburg, 186 So.2d 68 (Fla. 2d DCA 1966), and Town of Mount Dora v. Bryant, 128 So.2d 4 (Fla. 2d DCA 1961).[1] We are as concerned with the results of those decisions as was the court in City of Tampa. Judge McNulty there concluded that those cases should be overruled because of Hargrove and Modlin. Although Modlin has now been overruled by Commercial Carrier, we would still conclude that Town of Mount Dora and Evanoff should be overruled based on our conclusions reached here regarding the Evangelical and Johnson tests adopted in Commercial Carrier. We believe State v. Neilson, 419 So.2d 1071 (Fla. 1982), supports our reasoning and analysis in this case thus far, since there, our supreme court said:
In answering the question presented here it is necessary to return to our decision in Commercial Carrier. In that case, Justice Sundberg, in a thorough analysis of the law in this area, distinguished between *1001 that part of the sovereign immunity doctrine involving negligent tortious conduct waived by section 768.28, Florida Statutes (1977), and that part of the sovereign immunity doctrine identified at times as official or governmental immunity not waived by the statute. In the latter, absolute immunity attaches to "policy-making, planning, or judgmental governmental functions." 371 So.2d at 1020. The underlying premise for this immunity is that it cannot be tortious conduct for a government to govern. Our decision recognized that there are areas inherent in the act of governing which cannot be subject to suit and scrutiny by judge or jury without violating the separation of powers doctrine. We reiterate the reason for this immunity as quoted in Commercial Carrier from Evangelical United Brethren Church v. State, 67 Wash.2d 246, 254, 407 P.2d 440, 444 (1965):
The reason most frequently assigned is that in any organized society there must be room for basic governmental policy decision and the implementation thereof, unhampered by the threat or fear of sovereign tort liability, or, as stated by one writer, "Liability cannot be imposed when condemnation of the acts or omissions relied upon necessarily brings into question the propriety of governmental objectives or programs or the decision of one who, with the authority to do so, determined that the acts or omissions involved should occur or that the risk which eventuated should be encountered for the advancement of governmental objectives." Peck, The Federal Tort Claims Act, 31 Wash.L.Rev. 207 (1956).

Commercial Carrier, 371 So.2d at 1019 (emphasis added).
Id., 419 So.2d at 1075.
Our problem in deciding this case derives from the holding in Commercial Carrier that:
So we, too, hold that although section 768.28 evinces the intent of our legislature to waive sovereign immunity on a broad basis, nevertheless, certain "discretionary" governmental functions remain immune from tort liability. This is so because certain functions of coordinate branches of government may not be subjected to scrutiny by judge or jury as to the wisdom of their performance. In order to identify those functions, we adopt the analysis of Johnson v. State, supra, which distinguishes between the "planning" and "operational" levels of decision-making by governmental agencies. In pursuance of this case-by-case method of proceeding, we commend utilization of the preliminary test iterated in Evangelical United Brethren Church v. State, supra, as a useful tool for analysis.
Recurring, then, to the instant cases. It is apparent that the maintenance of a traffic signal light which is in place does not fall within that category of governmental activity which involves broad policy or planning decisions. This is operational level activity.
371 So.2d at 1022 (footnote omitted). Perhaps the problem is that too much emphasis has been placed on the last quoted sentence: "This is operational level activity." Id. at 1022. We believe that merely because an activity is "operational", it should not necessarily be removed from the "category of governmental activity which involves broad policy or planning decisions." Id. at 1022. We believe that though Deputy Parker's activities were clearly operational, they also involved basic governmental policy and the implementation thereof as emphasized by the court in Neilson. Certainly, law enforcement is basic to government. Failure to adequately maintain or even to install adequate traffic control devices might eventually result in a certain amount of chaos as regards our transportation system. However, failure to maintain good, adequate, and reasonable law enforcement would not just be chaotic, it would be disastrous. Absolutely essential to a good, adequate, and reasonable system of law enforcement as we now know it is its own operation level activities, and essential in those operational level activities is the discretion of a law enforcement officer under *1002 the circumstances of a particular case to decide whether or not to detain or arrest someone.
Our recognition of a law enforcement officer's discretion not to invoke the criminal process is not unique to us, and lest some view that premise with alarm we here quote selections from studies recognizing that discretion.
Professor Joseph Goldstein, in his article, "Police Discretion Not to Invoke the Criminal Process: Low-Visibility Decisions in the Administration of Justice", 69 Yale L.Jr. 543, 543 (Mar. 1960), makes the following statement:
Police decisions not to invoke the criminal process largely determine the outer limits of law enforcement. By such decisions, the police define the ambit of discretion throughout the process of other decisionmakers  prosecutor, grand and petit jury, judge, probation officer, correction authority, and parole and pardon boards. These police decisions, unlike their decisions to invoke the law, are generally of extremely low visibility and consequently are seldom the subject of review. Yet an opportunity for review and appraisal of nonenforcement decisions is essential to the functioning of the rule of law in our system of criminal justice.
(Footnotes omitted.) Goldstein notes further that:

Full enforcement, ... is not a realistic expectation. In addition to ambiguities in the definitions of both substantive offenses and due-process boundaries, countless limitations and pressures preclude the possibility of the police seeking or achieving full enforcement. Limitations of time, personnel, and investigative devices  all in part but not entirely functions of budget  force the development, by plan or default, of priorities of enforcement. Even if there were "enough police" adequately equipped and trained, pressures from within and without the department, which is after all a human institution, may force the police to invoke the criminal process selectively. By decisions not to invoke within the area of full enforcement, the police largely determine the outer limits of actual enforcement throughout the criminal process.
Id. at 560-62 (footnotes omitted).
Additionally, Professor Wayne R. LaFave, in his study, "Arrest: The Decision to Take a Suspect Into Custody", written for the American Bar Association as part of the Administration of Criminal Justice Series, opens with the following statement:
This volume deals with the decision to take custody of a person suspected of criminal behavior. This decision is obviously an important exercise of official power, from the point of view of both the individual involved and the system of criminal justice administration. Arrest results in detention of the individual, usually a search of his person, sometimes the use of force, and often, with the possible exception of the chronic offender, damage to his reputation. In most cases, decisions to charge, to convict, and to sentence are made only with respect to those persons whom the police have first arrested. Thus, to a large extent, this decision determines those offenders against whom the official process is to be invoked. Its importance necessitates concern with who makes the decision to arrest, how it is made, and particularly how it is controlled in order to insure its conformance with the basic objectives of consistency and fairness.
Id. at 3 (footnotes omitted). He continues:
4. The need for discretion. It is obvious that in practice some discretion must be employed somewhere in the existing criminal justice system. The exercise of discretion in interpreting the legislative mandate is necessary because no legislature has succeeded in formulating a substantive criminal code which clearly encompasses all conduct intended to be made criminal and which clearly excludes all other conduct.
... .
... [T]he exercise of discretion seems necessary in the current criminal justice system for reasons unrelated to either the interpretation of criminal statutes or the *1003 allocation of available enforcement resources. This is because of the special circumstances of the individual case, particularly the characteristics of the individual offender which "differentiate him from other offenders in personality, character, sociocultural background, the motivations of his crime, and his particular potentialities for reform or recidivism." The infinite variety of individual circumstances complicates administration by mere application of rules. Justice Charles D. Breitel, who has had extensive administrative, legislative, and judicial experience, stresses this point:
If every policeman, every prosecutor, every court, and every post-sentence agency performed his or its responsibility in strict accordance with rules of law, precisely and narrowly laid down, the criminal law would be ordered but intolerable.
Individualized treatment of an offender, based upon the circumstances of the particular case, is well recognized at the sentencing stage, where discretion is provided. These same circumstances may be apparent at the arrest stage and may seem to the police to dictate that the criminal process not be invoked against a particular offender. While sentence discretion is widely recognized, arrest discretion is not. This may reflect an assumption that, while individual circumstances may justify mitigation, the individualization of criminal justice should never go so far as to result in the complete exoneration of a particular offender. The contrary view is that the individual circumstances sometimes make conviction and even arrest excessive, so that proper administration requires the exercise of discretion at the early as well as at subsequent stages in the process.
Id. at 69-70, 71-72 (footnotes omitted).
In regard to the exercise of discretion at the subsequent stages of the criminal process, we encourage a close reading of Judge Hurley's opinion in Berry v. State, 400 So.2d 80 (Fla. 4th DCA 1981), regarding judicial and prosecutorial immunity in light of section 768.28. It would seem less than fair to not impose immunity as a result of the actions of the officer in the street under the pressures of the moment when immunity in the same case would be afforded the judge and prosecutor for their deliberate actions in the cool light of day.
We have wrestled long and hard with the problems presented by this case and the various theories involved. We have determined that the unique situation presented here is the square peg that will not fit either the "operational," "planning," or "discretionary"  "nondiscretionary" tests as set forth in Commercial Carrier and its progeny. We feel, however, that our supreme court in Commercial Carrier did not impose the "operational" test as an absolute restriction on immunity, and we therefore conclude that this case meets the four-pronged Evangelical test adopted in Commercial Carrier: (1) Does the challenged act necessarily involve a basic governmental program"? Yes, that program being a reasonable system of law enforcement. (2) Is the act or decision essential to the accomplishment of that program as opposed to one which would change the course of the program? Yes, because we believe that to remove discretion from the operational level of law enforcement would make a radical change in the ability to maintain a reasonable, workable system of law enforcement. (3) Does the act or decision require the exercise of basic policy evaluation, judgment, and expertise? Yes, because probably nowhere else is evaluation, judgment, or expertise so immediately necessary as it may affect citizens' basic rights as with the law enforcement officer in the field. (4) Is there involved the lawful authority and duty to make the decision? Yes, again because if discretion were removed, law enforcement would necessarily undergo radical and unknown changes.
We, therefore, determine that the proper planning and implementation of a viable system of law enforcement for any governmental unit must necessarily include the discretion of the officer on the scene to arrest or not arrest as his judgment at the *1004 time dictates. When that discretion is exercised, neither the officer nor the employing governmental entity should be held liable in tort for the consequences of the exercise of that discretion. In reaching our decision, we are not unmindful of the decisions in Downs v. United States, 522 F.2d 990 (6th Cir.1975); Liuzzo v. United States, 508 F. Supp. 923 (E.D.Mich. 1981); and Simon v. Heald, 359 A.2d 666 (Del. Super. Ct. 1976). Were we called upon to make those decisions, to the extent not controlled by the Federal Tort Claims Act, 28 U.S.C.A. §§ 1346(b)-1346(f) (1976), we would have reached a contrary result.
We also reject any assertion that sections 30.07[2] and 30.15[3], Florida Statutes (1979), creates a special standard of duty and liability for sheriffs and their deputies.
Although not argued by the parties, we have considered section 856.011, Florida Statutes (1979), relating to disorderly intoxication. That statute contains a proviso that a law enforcement officer taking certain acts in regard to an intoxicated person shall be considered as carrying out his official duties. That proviso language creates no liability not otherwise specifically imposed.
Therefore, because Deputy Parker exercised a discretion inherent both in the nature of enforcement and in the implementation of basic planning level activity, we affirm the order of the trial court.
HOBSON, A.C.J., and RYDER, J., concur.
NOTES
[1] Evanoff v. City of St. Petersburg, 186 So.2d 68 (Fla. 2d DCA 1966), and Town of Mount Dora v. Bryant, 128 So.2d 4 (Fla. 2d DCA 1961), both involve factual situations where a police officer was pursuing a suspect vehicle when the suspect vehicle was involved in a collision with a third vehicle. In neither case was the pursuing police car involved in the collision. In both cases, the court held that sovereign immunity did not apply and that the city whose police car was involved in the chase could be liable for the actions of the officer involved.
[2] Section 30.07, Florida Statutes (1979):

Deputy sheriffs.  Sheriffs may appoint deputies to act under them who shall have the same power as the sheriff appointing them, and for the neglect and default of whom in the execution of their office the sheriff shall be responsible.
[3] Section 30.15, Florida Statutes (1979):

Powers, duties, and obligations.  Sheriffs, in their respective counties, in person or by deputy, shall:
(1) Execute all process of the Supreme Court, circuit courts, county courts, and boards of county commissioners of this state, to be executed in their counties;
(2) Execute such other writs, processes, warrants, and other papers directed to them, as may come to their hands to be executed in their counties;
(3) Attend all terms of the circuit court and county court held in their counties;
(4) Attend all meetings, and execute all orders, of the boards of county commissioners of their counties; for which services they shall receive such compensation, out of the county treasury, as said boards may deem proper;
(5) Be conservators of the peace in their counties;
(6) Suppress tumults, riots, and unlawful assemblies in their counties with force and strong hand when necessary;
(7) Apprehend, without warrant, any person disturbing the peace, and carry him before the proper judicial officer, that further proceedings may be had against him according to law;
(8) Have authority to raise the power of the county and command any person to assist them, when necessary, in the execution of the duties of their office; and, whoever, not being physically incompetent, refuses or neglects to render such assistance, shall be punished by imprisonment in jail not exceeding 1 year, or by fine not exceeding $500;
(9) Be, ex officio, timber agents for their counties; and
(10) Perform such other duties as may be imposed upon them by law.