460 So.2d 452 (1984)
Terry Louis DAVIS, Appellant,
v.
STATE of Florida, DEPARTMENT OF CORRECTIONS, Appellee.
No. AR-120.
District Court of Appeal of Florida, First District.
December 3, 1984.
Thomas G. Sherman of DeMeo & Sherman, P.A., Coral Gables, Mark Baer, Miami, for appellant.
Jim Smith, Atty. Gen. and Kelly Overstreet Johnson, Asst. Atty. Gen., Tallahassee, for appellee.
JOANOS, Judge.
Appellant Davis, an inmate at Florida State Prison, was stabbed on the morning of September 9, 1975, while standing in his cell, by another inmate, William Freeman. Freeman had been incarcerated for first degree murder and assault with intent to commit murder, and Davis had been incarcerated for breaking and entering. Davis also recently had attempted to escape and had just been moved from a maximum confinement area into the open population area of the prison the day before the stabbing. There were no witnesses to the stabbing. The guard on duty was performing other duties, specifically, seeing that the different sections of prisoners proceeded to their work assignments. Freeman was assigned to work in the culinary department.
Freeman had previously stabbed a fellow inmate at the Dade County Jail. During processing at Lake Butler, he had been recommended for close custody classification by a corrections officer and a psychologist. *453 The corrections officer reported that Freeman appeared to be en route to becoming a serious disciplinary problem, and that Freeman had said "that an organization is out to get him. He states that he will get them first if he is in population before they get him." The psychologist reported that Freeman was impulsive with poor judgment and minimal insight and that he possessed anti-social tendencies, was hyperactive and negative and could be severely depressed.
Davis sued Freeman and the Department of Corrections ("DOC"), alleging, among other things, that DOC was negligent in its classification of Freeman and placement of Freeman in close proximity to Davis in the open population wing; negligent in its supervision of the facility; and negligent in having an insufficient number of supervisory and security personnel to safely maintain the facility. The lower court entered summary judgment for DOC, determining that the allegation of negligent classification was non-actionable under Commercial Carrier Corp. v. Indian River County, 371 So.2d 1010 (Fla. 1979); the allegations regarding number and placement of security personnel were also non-actionable as discretionary activity by DOC; and that based on the pleadings, depositions, and affidavits, it was unforeseeable as a matter of law that Freeman would attack Davis, and the alleged injuries were caused solely by an intervening criminal act.
The record reflects that Florida State Prison is a maximum security prison and virtually all of the inmates there are classified for close custody. There are different statuses within close custody, specifically, close management I and II, and administrative or disciplinary confinement. According to the record, close management I and II involve close monitoring of inmate behavior, usually due to disciplinary problems. Administrative and disciplinary confinement involve segregation of the inmate from the rest of the prison population. Among the functions of administrative confinement is observation of an inmate upon arrival at Florida State Prison. Freeman had been in administrative confinement in April, 1975.
DOC's affidavits indicated there were no classification guidelines in effect, and classification decisions were based on the inmate's age, prior record, the nature of the offense, length of sentence, and need for available treatment programs.
Davis's primary argument on appeal is that the classification and placement of Freeman was not a discretionary function of DOC, but that the classification of a specific individual does not involve a basic policy evaluation and is therefore operational and not subject to sovereign immunity. He contends that Freeman's history, particularly his prior attack on a jail inmate and his statement about "getting" someone in population, calls into question whether DOC made a considered decision in housing him in open population. He also contends the alleged negligent placement of supervisory personnel involved implementation of a policy decision which had already been made.
We conclude the lower court did not err in granting summary judgment in this case. The classification and placement of inmates within the prison system constitutes a discretionary planning level function under the tests set forth in Commercial Carrier, therefore sovereign immunity applies. In addition, the number and placement of supervisory personnel constitutes a discretionary decision, Cf. Relyea v. State, 385 So.2d 1378 (Fla. 4th DCA 1980); Ellmer v. City of St. Petersburg, 378 So.2d 825 (Fla. 2d DCA 1979); Wong v. City of Miami, 237 So.2d 132 (Fla. 1970). The allegations in this case do not bring it within the exception noted in Relyea for torts committed during implementation of security objectives "such as the accidental discharge of a weapon by security personnel, or the negligent failure of personnel to perform as instructed or intended."
Smith v. Department of Corrections, 432 So.2d 1338 (Fla. 1st DCA 1983), is distinguishable from the present case because of the inference in that case that the inmate was given preferential treatment, *454 reclassified for improper reasons unrelated to the prison function, and therefore placed in an inadequately supervised situation. No such inference of improper personal motivation exists in the present case.
The ruling on appellant's first issue renders the issue of foreseeability moot. We conclude, however, that this case involves a question of great public importance and certify the following question to the Florida Supreme Court:
WHETHER PRISON INMATE CLASSIFICATION CONSTITUTES A DISCRETIONARY FUNCTION OF THE DEPARTMENT OF CORRECTIONS FOR PURPOSES OF SOVEREIGN IMMUNITY?
AFFIRMED.
PEARSON, TILLMAN (Ret.), Associate Judge, concurs.
ERVIN, C.J., dissents with written opinion.
ERVIN, Chief Judge, dissenting.
I dissent. Despite the Department's knowledge that Freeman had assaulted another inmate less than a year before his infliction of injury upon Davis, despite evidence of his paranoidal delusions and his threats to get others before they got him, despite recommendations that Freeman be placed in close custody, and despite an affidavit of an expert in corrections that the Department was negligent in allowing Freeman to remain in open population, the lower court granted summary judgment, holding that the alleged negligent classification of Freeman by the Department of Corrections was nonactionable. I am aware that an inmate classification supervisor testified that a prisoner who is close custody may be allowed to be in open population, however he also testified that there were various types of subdivisions within the major classification of close custody, including administrative confinement and disciplinary confinement. The former meant a place to review the inmate or to observe him in an environment where he would be less prone to involve himself in any disruptive behavior. The latter subclassification required the inmate to be housed in a different wing than where Davis was placed at the time of the incident.
Notwithstanding the discretion given the Department to make a reasoned choice as to the category of custody in which to place Freeman, its decision for him to remain in open prison population cannot, under the circumstances, be considered a judgmental decision made at the planning level and therefore one immune from liability. Following Department of Transportation v. Neilson, 419 So.2d 1071, 1077 (Fla. 1982), I am of the view that the Department's decision should be considered one inherently defective in that it created a "known dangerous condition" and failed to warn others who might be foreseeably harmed of the danger. The Department's choice over other alternatives can be likened to a governmental entity's election to build a highway having a curve, with the knowledge that vehicles cannot safely negotiate it at speeds of more than twenty-five miles per hour. Id. at 1078. Its decision to design the curve is itself nonactionable, but if the governmental entity fails to warn the motoring public of the hazard, it can be held liable. The basis for liability is that the agency had created a latent danger of which it had knowledge and others did not and, having done so, it was under a duty "to avert the danger or properly warn persons who may be injured by that danger." St. Petersburg v. Collom, 419 So.2d 1082, 1086 (Fla. 1982). If a jury in Smith v. Department of Corrections of State, 432 So.2d 1338, 1340 (Fla. 1st DCA 1983), could reasonably conclude that violence to third persons was a foreseeable consequence of the Department's placing a dangerous inmate in minimum custody, I fail to see why a jury should not be given the same opportunity to decide the question of the agency's liability in the present case, in view of its knowledge both of his past record of assaults and his continued inclination to do 30.
My view is consistent with that of holdings in other jurisdictions, requiring as a *455 condition to recovery from a governmental unit, allegedly caused by its negligence in permitting the infliction of injuries upon one prisoner by another, that the entity must have knowledge of some unusual danger, or reason to anticipate the danger. See, e.g., Flaherty v. State, 296 N.Y. 342, 73 N.E.2d 543 (1947); City of Lexington v. Greenhow, 451 S.W.2d 424 (Ky. 1970); Cohen v. United States, 252 F. Supp. 679 (D.C. Ga. 1966), rev'd on other grounds, 389 F.2d 689 (5th Cir.1967). See also, Annot., 41 A.L.R.3d 1021, 1030 (1972). Accord, Spann v. State, Department of Corrections, 421 So.2d 1090, 1092 (Fla. 4th DCA 1982) ("In order to find that the custodian's negligence was a proximate cause of the injury it must be shown that the injury was a reasonably foreseeable consequence of that negligence."). Spann offered two examples of the above rule, the first nonactionable, and the second submissible for jury consideration:
When a guard is negligent it is possible but not probable that one inmate will set another on fire or otherwise intentionally injure him. On the other hand if the custodial authority is on notice that one inmate "has it in for" another inmate then such a possibility becomes less remote and approaches probability.
Id. at 1093.
The Spann opinion and many of the cases relied upon by Spann contained in the annotation at 41 A.L.R.3d 1021 appear to approach the problem more in terms of whether the causation chain, created by the agency's negligent failure to warn, was broken by an active, intervening cause, rather than whether there was no duty, because the decision not to warn was a discretionary-level function. In my judgment, the Spann approach is the more reasonable one to follow in those situations disclosing that a governmental entity has knowledge that its actions have created or contributed to the existence of a latent hazard, dangerous to others. A duty to use reasonable care under such circumstances should be held to exist, and if injury results from the intentional act of another, the question of proximate causation could then be determined by applying the rule of foreseeability. See Gibson v. Avis Rent-A-Car System, Inc., 386 So.2d 520 (Fla. 1980).
Following the rule requiring the responsible authorities to use reasonable care to persons in their charge, some jurisdictions have held that the fact of placing a person arrested on a drunkenness charge in the same cell with a convicted murderer, who injured the former, was sufficient to bring the case to the jury's attention, once it was also shown that the jailer had prior knowledge of the assailant's dangerous propensities. Glover v. Hazlewood, 387 S.W.2d 600 (Ky. 1964). Accord, Murphy v. United States, 653 F.2d 637 (D.C. Cir.1981); Doe v. City of Albuquerque, 96 N.M. 433, 631 P.2d 728 (App. 1981). Additionally, a complaint, alleging that a county had knowledge of the unsafe condition of jail facilities and of assaults on appellant, was held to have stated a cause of action in a case seeking damages for injuries inflicted upon an inmate by other prisoners. White v. County of Palm Beach, 404 So.2d 123 (Fla. 4th DCA 1981).
The Department, in maintaining custody over both Freeman and Davis, occupied a special relationship with both. Its responsibilities to them included not only their custody, but their government, care, supervision and discipline. See §§ 944.031(3), 944.09(1) and 944.14, Fla. Stat. Davis, the assaulted inmate  unlike the public at large  had no choice over where he was housed. He was placed, at the Department's direction, immediately next to a convicted murderer, one who the Department knew had not only past, but continuing propensities toward violence. Moreover, it was while plaintiff was within his own cell that he was brutally attacked by Freeman. By analogy, California courts have recognized that when a governmental agent maintains a special relationship with the offender or to the potential victim, a duty arises from such relationship to warn a named or readily identifiable victim or group of victims. Tarasoff v. Regents of University of California, 17 Cal.3d 425, *456 131 Cal. Rptr. 14, 551 P.2d 334 (1976); Thompson v. County of Alameda, 27 Cal.3d 741, 167 Cal. Rptr. 70, 614 P.2d 728 (1980).
Having said the above, I can readily understand the result reached by the majority, given the present amorphous standard of reviewing governmental tort action. Although the Neilson standards can be simplistically stated, unfortunately their application, as today's opinion exemplifies, is an altogether different matter. A little more than two years ago I wrote in dissent in Harrison v. Escambia County School Board, 419 So.2d 640 (Fla. 1st DCA 1982), affirmed, 434 So.2d 316 (Fla. 1983), after surveying a number of appellate court decisions on the subject which post-dated Commercial Carrier Corporation v. Indian River County, 371 So.2d 1010 (Fla. 1979), that the opinions were in hopeless and irreconcilable conflict. I then advanced the view that unless the analysis of Johnson v. State, 69 Cal.2d 782, 73 Cal. Rptr. 240, 447 P.2d 352 (1968), were adopted for gauging the two levels of governmental activity, the decisions were likely to remain unreconciled. Shortly thereafter the Florida Supreme Court decided the Neilson trilogy (Department of Transportation v. Neilson; Ingham v. State, Department of Transportation, 419 So.2d 1081 (Fla. 1982); City of St. Petersburg v. Collom). Three basic rules appear to have emerged from these opinions: (1) Defects that are inherent in the overall plan of a capital improvement project are not actionable under section 768.28. (2) Defects not inherent in the overall plan of the project are actionable. (3) Regardless of whether the defect is inherent in the overall plan, if the governmental entity creates a known dangerous condition which is not readily apparent to persons who could be injured by the condition, a duty at the operational-level arises to warn the public of, or protect them from, the known danger.[1]
In the two years following the modification of the Commercial Carrier rules by the Neilson trilogy, we see the same general lack of consistency in the various appellate court opinions applying the rules that pre-dated Neilson. Thus, the Second District Court of Appeal has held that a law enforcement officer who fails to take into custody an obviously inebriated motorist, whose condition later causes injury to others, does so in a lawful exercise of discretion and simply implements a basic planning level activity. See Everton v. Willard, 426 So.2d 996 (Fla. 2d DCA 1983); City of Cape Coral v. Duvall, 436 So.2d 136 (Fla. 2d DCA 1983). The Fifth District Court of Appeal, however, has reached the opposite result, holding that because the complaint alleged the officer knew the motorist was intoxicated, yet failed to detain or arrest him, there was no ground for a finding of immunity, and, under such circumstances "the police officer is merely implementing policy by enforcing the laws, and cannot be said to be exercising a discretionary governmental function." Huhn v. Dixie Insurance Company, 453 So.2d 70, 77 (Fla. 5th DCA 1984). The Second District Court of Appeal, in a case involving the alleged negligence of certain law enforcement officers caused by their failure to protect a member of the public from a sexual assault, notwithstanding the officers' knowledge of the inmate's record of assaultive behavior, adhered to its former decisions in Everton and City of Cape Coral, and held that sovereign immunity barred recovery. Ursin v. Law Enforcement Insurance Co., Ltd, 450 So.2d 1282 (Fla. 2d DCA 1984).
The supreme court's opinions on the subject have hardly been models of clarity. In Harrison v. Escambia County School Board 434 So.2d 316 (Fla. 1983), the court upheld a dismissal of a complaint with prejudice, despite factual allegations stating "that the defendant School Board knew or should have known that its designated school bus stop ... was attended by unusual *457 traffic hazards which created a dangerous condition for the children approaching or congregating in the vicinity of this school bus stop in anticipation of being picked up by school buses operated by the School Board." Id. at 318, n. 2. Although the court reiterated what it had said in Neilson, that "the failure to warn of a known danger created by the governmental body is a negligent omission at the operational level which may serve as the basis for a cause of action," it held that Harrison's complaint alleging "unusual traffic hazards" did not comply with the requirements in Collom and Neilson that specific allegations of a known trap or a known dangerous condition be pled. 434 So.2d at 320, 321.
Two weeks following the Harrison decision, the court in Perez v. Department of Transportation, 435 So.2d 830 (Fla. 1983), observed that the plaintiffs had attempted in their complaints to allege a failure of a duty to warn of a known dangerous condition existing on a bridge whose steel grating over the years since the bridge's construction had become travel worn and therefore hazardous to motorists. The Perez court then remanded the case with directions that the plaintiffs be allowed to amend their complaints by alleging a failure of a duty to warn. Apparently the court had concluded in its earlier opinion in Harrison that there was no allegation of fact that could have been sufficiently alleged to state a cause of action. Perhaps the court's decision in Harrison, holding the complaint so deficient as to be unable to survive a motion to dismiss, can be explained by the reason that the known danger arose from the inherent design itself and, regardless of the passage of time from the government's knowledge of the hazard, before subsequent steps are implemented to correct the hazard, the original decision was unaffected by such later condition and is therefore immune. This was the conclusion reached by the Fourth District Court of Appeal in regard to a governmental entity's failure to install a traffic signal at an intersection near a school, which allegedly contributed to an accident killing a student. Broward County v. Payne, 437 So.2d 719 (Fla. 4th DCA 1983) approved, 461 So.2d 63 (Fla. 1984). Thus any delay between the decision to install a traffic light and the actuality of the installation extended the planning immunity cloak during such hiatus. And, notwithstanding the knowledge the governmental officials had of the dangers attending the intersection, sovereign immunity attached, in that the "circumstances failed to create a known danger not readily apparent to potential victims, or a trap, and there was no such hidden danger or trap." 461 So.2d at 66.
Less than two months following the Fourth District's decision in Payne, the supreme court decided Department of Transportation v. Webb, 438 So.2d 780 (Fla. 1983), holding that the failure to upgrade a railroad intersection known to be dangerous was a planning level function and immune, but a decision not to place warning signs at the crossing was an operational-level function. Thus, one may conclude from the above cases, that notwithstanding the knowledge of the governmental entity that a capital project which it had created was attended with dangers, the failure to upgrade the project or to install traffic control devices is not activity sufficient to give rise to liability, since such decisions inhere in the original plan  nevertheless, a conscious decision not to place warning signs, assuming the project created latent dangers, is an operational-level function and constitutes negligence. Such distinctions, when applied to a specific factual situation  particularly when the decision as here does not involve a capital project  are the stuff from which inconsistency abounds. The narrow, restricted construction placed upon section 768.28 by Neilson and the court's later cases is moreover at variance with the legislative purpose, which, in the words of Commercial Carrier, "evinces the intent ... to waive sovereign immunity on a broad basis ... ." 371 So.2d at 1022 (e.s.).
*458 Justice Sundberg, dissenting in Neilson, was critical of the standards adopted by the majority, commenting "that the majority has simply exchanged one set of result descriptive labels for another. Hence, the irreconcilable results among the several district courts of appeal are not harmonized, but rather the confusion is compounded." 419 So.2d at 1079. He concluded it should make little difference for liability purposes, once the public entity possessed knowledge of the capital improvement's capacity for danger, whether the government failed to upgrade the project, install traffic signals or warning signs. Neither did it make any difference, from his summary of out-of-state cases, whether the danger was latent or patent. In his view the existence of a danger open to the public does not obviate the need of the responsible agency to remedy a hazard which is caused by changed conditions occurring after the design of a capital project. See also Baldwin v. State, 6 Cal.3d 424, 99 Cal. Rptr. 145, 491 P.2d 1121 (1972).
Justice Sundberg's prophesy that the Neilson rule would compound the confusion among the appellate courts has now been realized. The Second District Court of Appeal, in affirming the dismissal of a complaint against the Department of Environmental Regulation, which had alleged that DER was negligent in failing to construct a fence or warning devices around a sewage treatment tank into which a child had fallen and drowned, commented: "The circumstances here present another `square peg that will not fit either the "operation," "planning," or "discretionary-non-discretionary" tests as set forth in Commercial Carrier or its progeny.'" Neumann v. Davis Water and Waste, Inc., 433 So.2d 559, 563 (Fla. 2d DCA 1983). The Fourth District Court of Appeal in Carter v. City of Stewart, 433 So.2d 669 (Fla. 4th DCA 1983), observing that the Florida case law on the subject of what constitutes a planning or operational level function is in "disarray," then announced its intention in every case in which the issue was raised to certify the question to the Florida Supreme Court in an effort to "let our superiors show us the way until the law is clarified or Commercial Carrier is receded from." Id. at 670.
Another jurist, Judge Glickstein, in a well-reasoned, specially concurring opinion in Manors of Inverrary XII v. Atreco-Florida, 438 So.2d 490, 494 (Fla. 4th DCA 1983), has called for the adoption of the three-pronged test postulated in Hendry v. United States, 418 F.2d 774 (2d Cir.1969), to determine the level of governmental activity when the issuance of permits or licenses is involved. Without reiterating in detail the Hendry test, I think it can safely be said that it depends in large measure on the application of the operational-discretionary level standards of review. My criticism of such standards is much the same as that of the Oregon Supreme Court:
The difficulty with all these attempts to state the distinction between "discretionary" and "ministerial" is that all, or almost all, acts performed by government employees involve some judgment or choice; that is, the employees have more than one alternate course of performance and they make a decision to follow one of the several alternatives. The issue is really, how much "discretion" must be involved in the performance so as to render the employee immune? This means that at some point along the continuum of discretion a division must be made with liability on one side and immunity on the other and this division must necessarily be arbitrary.
Smith v. Cooper, 256 Or. 485, 475 P.2d 78, 85 (Or. 1970). Other out-of-state commentators voice similar complaints: "The distinction between activities at the `operational level' and those at the `planning level' is susceptible of no greater precision in definition than the distinction between activities which are `governmental' and those which are `non-governmental' or `proprietary'... ." Peck, The Federal Tort Claims Act  A Proposed Construction of Discretionary Function Exception, 31 Wash. L. Rev. 207, 219 (1956) . Again, "[t]he fundamental difficulty with the planning-operational approach is that it is likely to *459 become a mere labeling approach... . As with the case of the older governmental-proprietary test of municipal liability, it is evident that either term may be applied in a given situation, depending on how expansively or narrowly one interprets the problem or on the result desired... ." Note, The Discretionary Exception in Municipal Tort Liability: A Reappraisal, 52 Minn.L.Rev. 1047, 1062 (1968).
By following what is in effect a modification of the discretionary function exception to the Federal Tort Claims Act (28 U.S.C. § 2680(a)), Florida courts face the same inconsistent results that have plagued the federal judiciary since that act's inception nearly forty years ago; for example, a decision not to place culverts under a highway was considered to be an omission at the planning stage, Mahler v. United States, 306 F.2d 713 (3d Cir.1962); while a failure to install a handrail stair-way in a public building was considered an omission at the operational level. American Exchange Bank of Madison, Wis. v. United States, 257 F.2d 938 (7th Cir.1958). Given the experience of out-of-state and federal courts, as well as our inconsistent track record, I doubt that any standard of review which depends upon the discretionary-operational level dichotomy will ever result in being uniformly applied.
I therefore respectfully invite the Florida Supreme Court to revisit its prior opinions on the subject, rescind their holdings, and simply give effect to the legislative directive expressed in section 768.28(5): to impose liability upon the state and its subdivisions "in the same manner and to the same extent as a private individual under like circumstances...."[2] In issuing this invitation I am not unaware that both Commercial Carrier and Neilson strongly intimated, while not expressly stating, that without the limiting construction, section 768.28 would be violative of the separation of powers clause. Thus Commercial Carrier, although recognizing that "Section 768.28 evinces the intent of our legislature to waive sovereign immunity on a broad basis," continues with the statement that "certain `discretionary' governmental functions remain immune from tort liability. This is so because certain functions of coordinate branches of government may not be subjected to scrutiny by judge or jury as to the wisdom of their performances." 371 So.2d at 1022. Neilson echoes the same concern, stating that Commercial Carrier "recognized that there are areas inherent in the act of governing which cannot be subject to suit and scrutiny by judge or jury without violating the separation of powers doctrine." 419 So.2d at 1075.
Both opinions relied largely upon Evangelical United Brethren Church v. State, 67 Wash.2d 246, 407 P.2d 440 (1965), and Weiss v. Fote, 7 N.Y.2d 579, 200 N.Y.S.2d 409, 167 N.E.2d 63 (1960), which had placed the same construction on their own states' broad waiver of immunity acts, as a means of barring the substitution of a decision by a judge or a jury in place of the decision of the governmental body as to the reasonableness of the planning activity conducted by that body. Commercial Carrier, 371 So.2d at 1018. Neither Evangelical United Brethren Church[3] nor Weiss  or indeed Commercial Carrier or Neilson  considered the question of the constitutionality *460 of a statute which had been enacted pursuant to a specific grant of constitutional power authorizing the legislature to establish the method by which suit could be brought against the state. Article X, Section 13 of the Florida Constitution states that "[p]rovision may be made by general law for bringing suit against the state as to all liabilities now existing or hereafter originating." (e.s.) This constitutional provision has traditionally been interpreted as providing absolute sovereign immunity for the state and its agencies absent waiver by legislative enactment or constitutional amendment. E.g., Spangler v. Florida State Turnpike Authority, 106 So.2d 421 (Fla. 1958); Circuit Court of Twelfth Judicial Circuit v. Department of Natural Resources, 339 So.2d 1113 (Fla. 1976). Article X, Section 13 thus limits the method for the exercise of the legislative power to the passage of general laws. 28 Fla.Jur., Governmental Tort Liability § 6 (1981). However, once the constitution provides that the legislature may consent for the state to be sued, the general rule is that the legislature is authorized to prescribe such modes, terms and conditions it sees fit, subject to any limiting restriction of its own constitution. 72 Am.Jur.2d, States, Territories and Dependencies § 124 (1974). Thus, "when the Constitution prescribes the manner of doing an act, the manner prescribed is exclusive... ." Weinberger v. Board of Public Instruction, 93 Fla. 470, 112 So. 253, 256 (Fla. 1927). Certainly there does not exist any express constitutional provision precluding the legislature from enacting, as it has, a broad waiver of immunity. Contrast Sullivan v. Askew, 348 So.2d 312 (Fla. 1977), cert. denied, 434 U.S. 878, 98 S.Ct. 232, 54 L.Ed.2d 159 (pardon power is exclusively vested in the executive branch by the constitution and cannot be exercised by another arm of government).
Does then a statute exhibiting a broad grant of waiver, one that is enacted pursuant to an explicit constitutional provision, necessarily collide with another constitutional provision, the separation of powers doctrine, found in Article II, Section 3 of the Florida Constitution, providing that "the powers of the state government shall be divided into legislative, executive and judicial branches"?[4] The test for determining whether a statute is violative of the separation of powers doctrine has been stated thusly:
"In construing, interpreting, and applying the Constitution of the state, the guiding star should be to effectuate its primary purpose, viz., the welfare of the people in the preservation and exercise of the rights of sovereignty and of individuals. The division of governmental powers into Legislative, executive, and judicial is abstract and general, and is intended for practical purposes. There has been no complete and definite designation by a paramount authority of all the particular powers that appertain to each of the several departments. Perhaps there can be no absolute and complete separation of all the powers of a practical government."
* * * * * *
A clear violation of the constitutional provisions dividing the powers of government into departments should be checked and remedied; but where a reasonable doubt exists as to the constitutionality of a statute conferring power, authority, and duties upon officers, the legislative will should be enforced by the courts to secure orderly government and in deference to the Legislature, whose action is presumed to be within its powers, and whose lawmaking discretion within its powers is not reviewable by the courts.
State v. Johnson, 345 So.2d 1069, 1071-1072 (Fla. 1977) (e.s.) (quoting from State v. Atlantic Coastline Railroad Co., 56 Fla. 617, 47 So. 969, 975 (1908)).
*461 I would think, given the fact that section 768.28 represents a direct implementation of Article X, Section 13, that the statute would ordinarily be deemed constitutionally valid. The statute can hardly be considered "a clear violation of the constitutional provisions dividing the powers of government into departments." In my judgment it represents an action which should properly be presumed to be within the legislature's powers. Courts in other jurisdictions that have dealt with similar statutes have upheld their validity notwithstanding such statutes' apparent infringement of other constitutional provisions. Thus in Dickson v. State, 1 Wis. 22 (1853), the Wisconsin Supreme Court upheld an act permitting suit to be filed against the state in the supreme court, although a provision of the state's constitution limited the court to appellate jurisdiction only, except in cases otherwise provided by the constitution. The act was the direct implementation of a constitutional provision permitting "the legislature ... [to] direct, by law, in what manner, and in what courts, suits may be brought against the state... ." Accord, Northwestern Mutual Life Insurance Co. v. State, 163 Wis. 484, 155 N.W. 609, 158 N.W. 328 (1915), aff'd., 247 U.S. 132, 38 S.Ct. 444, 62 L.Ed. 1025 (1918).
If the supreme court has in part based its decisions barring liability for discretionary governmental acts on policy considerations, then I would suggest a balancing of all such considerations would not be an inappropriate means of judging the act's constitutionality. A reason frequently assigned for the creation of sovereign immunity is that it is a rule of social policy, one that protects the state from burdensome interference from the performance of its governmental functions and preserves its control over state funds, property and instrumentalities. State ex rel. Davis v. Love, 99 Fla. 333, 126 So. 374 (Fla. 1930). The diversion of public funds for purposes other than those appropriated by law has long been considered a policy factor upholding the state's immunity from suit. See Bragg v. Board of Public Instruction, 160 Fla. 590, 36 So.2d 222 (1948). Certainly the legislature, in passing the broad grant of waiver authorized by section 768.28, must have taken all such traditional policy arguments into consideration. It was certainly aware that the state and its subdivisions could purchase liability insurance to cover their risks. See section 768.28(10). It was also aware that the act was not intended to compensate fully injured persons for their damages.
The remedies furnished by the act are far from generous. They presently limit the recovery in court to no more than $200,000 per incident and $100,000 per person.[5] Punitive damages are forbidden, as is prejudgment interest. Attorney's fees are restricted to no more than 25% of any judgment, and the state is not liable for acts of its agents when committed in bad faith, malicious purpose or in a manner displaying wanton and willful disregard of safety. Thus the act itself has built-in safety devices amply protecting an indiscriminate raid on the public treasury.
The legislature must also have known of the significance of its use of the words, subjecting the state to liability "in the same manner and to the same extent as a private individual under like circumstances... ."[6] The statutory waiver enacted in 1969 contained an explicit exception for a "discretionary function," section 768.15(1), Florida Statutes (1969), which was not included in the 1973 enactment.
*462 The current national trend of legislative and judicial action has been toward the abandonment of the sovereign immunity doctrine. Indeed, Professor Davis, writing in 1980, reports that the courts of 30-33 states have abolished "chunks" of sovereign immunity, whereas 30-34 states have enacted statutes which at least to some extent involved unconditional waivers of immunity, and an additional 12 have waivers conditional upon insurance. See, Davis, Administrative Law of the Seventies, Supplementing Administrative Law Treatise and 1980 Supplement to Administrative Law Treatise §§ 2518 and 25.00. See also collection of jurisdictions waiving sovereign immunity listed in Cauley v. City of Jacksonville, 403 So.2d 379, 386-87, n. 14 (Fla. 1981), and see 72 Am.Jur.2d, States, Territories and Dependencies, § 101 (1974). The national movement toward abolition of immunity is a reflection of what is perhaps the strongest policy argument favoring one's unrestricted right to bring suit, except as limited by statute, and it is expressed by the legal maxim that when an individual sustains an injury by the neglect of another, the law gives him a remedy. This maxim finds support in our constitution authorizing "courts ... [to] be open to every person for redress of any injury... ." Article I, Section 21, Fla. Const.
If the legislative intent, expressed in section 768.28, subjecting the state to liability in the same manner as a private person were followed, traditional tort principles would then guide a court's judgment when considering liability. Take, for example, the standard used in the private sector to determine an architect's liability for injuries caused by his negligence in the preparation of plans and specifications:
"An architect may be liable for negligence in failing to exercise the ordinary skill of his profession, which results in the erection of an unsafe structure whereby anybody lawfully on the premises is injured. Possible liability for negligence resulting in personal injuries may be based upon their supervisory activities, or upon defects in the plans or both. Their possible liability is not limited to the owner who employed them. Privity of contract is not a prerequisite to liability. They are under a duty to exercise such reasonable care, technical skill and ability, and diligence as are ordinarily required of architects in the course of their plans, inspections and supervisions during construction for the protection of any person who foreseeably and with reasonable certainty might be injured by their failure to do so."
Conklin v. Cohen, 287 So.2d 56, 61 (Fla. 1973) (quoting with approval, Geer v. Bennett, 237 So.2d 311, 316 (Fla. 4th DCA 1970)).
Subjecting the state and its subdivisions to liability to the same extent as non-governmental persons would not mean that all discretionary acts of government, resulting in injury, necessarily give rise to actionable claims. For example, a decision by a physician in private practice to prescribe a controlled drug to a known addict does not, absent a showing that such decision was made in bad faith or beyond the scope of his practice, render the physician liable to third parties injured as a result of the addict's abuse of the drug. Forlaw v. Fitzer, 456 So.2d 432 (Fla. 1984).
Admittedly, the facts in the case at bar  involving the governmental entity's allegedly negligent decision not to warn foreseeable victims of an inmate's dangerous propensities for violence  find no exact parallel in the private sector; nevertheless it is somewhat analogous to the liability subjected upon a privately owned institution for the negligent release of a dangerous person in its custody. See Burroughs v. Board of Trustees of Alachua General Hospital, 328 So.2d 538 (Fla. 1st DCA 1976).
Although there are no doubt strong policy arguments, as recognized in Commercial Carrier Corp. and in Neilson, concerning why tort liability should not be imposed on discretionary governmental functions, I submit that these arguments are best left addressed to the wisdom of the legislature  not the courts, and should not be given the imprimatur of constitutional prohibition. Finally  and certainly *463 not the least of the policy considerations favoring simple acceptance of the legislative directive  following the law of the private sector would have as its salutary purpose the promotion of the rule of stare decisis, a rule which is designed to promote uniformity, certainty and stability in the courts of law, Waller v. First Savings and Trust Company, 103 Fla. 1025, 138 So. 780 (1931). As long as the standard for determining governmental liability remains dependent upon degrees of discretion, uncertainty and confusion will persist, with the result that no one will be reasonably able to anticipate the possible consequences of an action brought under the act.[7]
NOTES
[1] See Note, Sovereign Immunity Trilogy: Commercial Carrier Revisited But Not Refined, 10 Fla.St.U.L.Rev. 702 (1983).
[2] I am no more confident that this invitation will be accepted than was Hotspur, regarding Glendower's boast of summoning forth spirits:

GLENDOWER. I can call spirits from the vasty deep.
HOTSPUR. Why, so can I, or so can any man, But will they come when you do call for them?
Henry IV, Part I, act 3, scene 1, The Complete Works of William Shakespeare (Cambridge Univ. Press 1983).
[3] The four-pronged test of Evangelical United Brethren Church v. State, commended by Commercial Carrier as a preliminary means of identifying the levels of decision-making activity by governmental agencies, has been further refined by the Washington Supreme Court in King v. City of Seattle, 84 Wash.2d 239, 525 P.2d 228, 233 (1974), now requiring "the state ... to make a showing that ... [its] policy decision, consciously balancing risks and advantages, took place. The fact that an employee normally engages in `discretionary activity' is irrelevant if, in a given case, the employee did not render a considered decision."
[4] It should be observed that the second sentence to Article II, Section 3 states: "No person belonging to one branch shall exercise any powers appertaining to either of the other branches unless expressly provided herein." (e.s.)
[5] The statute of course permits the injured person to file a claims bill in the legislature for any excess amount.
[6] Of course five regular legislative sessions have now come and gone since Commercial Carrier imposed judicially the discretionary function exception, but I do not believe it can be logically argued that later legislative inactivity reflects an acquiescence by it in the court's holding. The legislature could hardly be expected to amend the act further to reflect explicitly its intent that a discretionary function exception was not a cause for excluding the state from liability, given Commercial Carrier's strong intimation that any such provision imposing liability would be violative of the separation of powers clause.
[7] A recent law review comment echoes the same concerns:

The current state of Florida law regarding the waiver of sovereign immunity for tort liability remains fragmented and disordered, as evidenced by the recent decision in Webb. After Commercial Carrier set out an exception to the waiver for "planning," as opposed to "operational," functions, the Neilson trilogy amended this exception to the waiver doctrine to provide a cause of action for the creation of a known dangerous condition, but the elements of proof were not adequately defined. Courts were not certain how to merge the "known danger" component into the planning-operational scheme. As a result, that cause of action has proven difficult to isolate and identify. The Neilson trilogy not only fell short of clarifying the Commercial Carrier doctrine, it further confused it. Instead of adding to that obscurity, the supreme court should have taken the opportunity presented by Webb to provide definitive guidelines for the court-created waiver doctrine exception.
Comment, Sovereign Immunity  Revisited But Still Not Refined, 12 Fla.St.U.L.Rev. 401, 421 (1984).