Mr. Tom Herndon Executive Director State Board of Administration Post Office Box 13300 Tallahassee, Florida 32317-3300
Dear Mr. Herndon:
You ask several questions relating to the fiduciary duties of the State Board of Administration (SBA) in considering the divestiture of tobacco stock currently held by the Florida Retirement System Trust Fund (Fund). Your questions may be substantially restated as follows:
1. What is the standard of care to be exercised and the factors that may be considered by the State Board of Administration in deciding whether to divest stock currently held in the Florida Retirement System Trust Fund?
2. What is the potential liability of the State Board of Administration or its individual members for any decision taken by the board regarding divestiture of tobacco stock currently held in the Florida Retirement System Trust Fund?
In sum:
1. The State Board of Administration is obligated to consider the factors set forth in section 215.47(9), Florida Statutes (1996 Supplement), and must invest such monies to the fullest extent consistent with the cash requirements, trust agreement and investment objectives of the Fund. Moreover, the board must see that the monies invested are at all times handled in the best interests of the state and is required to discharge its duties solely in the interests of the Fund's participants and beneficiaries.
2. While Florida incorporates the standard of care provisions of Subchapter I of the Employees Retirement Income Security Act, it does not incorporate that Subchapter's liability provisions. Thus, liability for actions by the State Board of Administration is controlled by state law. The board is immune from liability for any planning level decision it makes concerning divestiture of tobacco stock and members of the board are not liable for any operational level decision unless they act wantonly and willfully or in bad faith.
As your questions are interrelated, they will be discussed together.
The members of the State Board of Administration are responsible for investing the monies in the Florida Retirement System Trust Fund.[1] The Fund is to be invested in a manner consistent with the cash requirements, trust agreement, and investment objectives of the Fund.[2] The SBA is responsible for ensuring that the monies invested are "at all times handled in the best interests of the state."[3]
Investments made by the SBA are subject to the restrictions and limitations contained in section 215.47, Florida Statutes (1996 Supplement), which provides in part:
"(9) Investments made by the State Board of Administration shall be designed to maximize the financial return to the fundconsistent with the risks incumbent in each investment and shall be designed to preserve an appropriate diversification of the portfolio. The board shall discharge its duties with respect to a plan solely in the interest of its participants and beneficiaries. The board in performing the above investment duties shall comply with the fiduciary standards set forth in the Employee Retirement Income Security Act of 1974 at 29 U.S.C. s. 1104(a)(1)(A) through (C). In case of conflict with other provisions of law authorizing investments, the investment and fiduciary standards set forth in this subsection shall prevail." (e.s.)
Section 215.47(9), Florida Statutes (1996 Supplement), therefore, requires the SBA to comply with the fiduciary standards of Subchapter I of the federal Employee Retirement Income Security Act of 1974 (ERISA), as amended.[4] Section 404(a)(1) of ERISA requires that fiduciaries discharge their duties with respect to a plan solely in the interests of the participants and the beneficiaries and
"(A) for the exclusive purpose of:
(i) providing benefits to participants and their beneficiaries; and
(ii) defraying reasonable expenses of administering the plan;
(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so[.]"
However, while Florida has grafted the federal "prudence" standard into state law, the other provisions of Subchapter I of ERISA do not apply to the Florida Retirement System Trust Fund. Subchapter I of ERISA, relating to the protection of employee benefit rights, was adopted to protect private pension plans and does not apply to "any employee benefit plan if . . . such plan is a governmental plan[.]"[5]
As a governmental plan, the Florida Retirement System Trust Fund is controlled by state law. Thus the provisions contained in Subchapter I of ERISA relating to fiduciary duty and the protection of employee benefit rights do not apply to the SBA except to the extent they are made applicable by state law. Since state law does not incorporate ERISA's personal liability provisions, such federal provisions do not control SBA members' liability.[6]
Section 215.47(9), Florida Statutes (1996 Supplement), incorporates ERISA's "prudence" standard by which to judge the wisdom of investments made by the SBA. Under the Restatement (Second) of Torts, a trustee is required to use due care, that is, the trustee must investigate the safety of the investment and its potential for income by securing reliable information. While a trustee may consider the advice of qualified experts, the trustee ultimately must exercise independent judgment in making these decisions. Whether a trustee has acted properly in selecting an investment depends upon the circumstances at the time the investment is made and not on subsequent events. Thus, if at the time an investment is made it is one that a prudent person would make, there is no liability if the investment later depreciates in value.[7]
Consistent with these common law principles, the courts have measured the federal act's "prudence" requirement according to a standard that focuses on the fiduciary's conduct in arriving at an investment decision, not on its results. This standard asks whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment.[8] This requirement, however, is flexible and the adequacy of a fiduciary's independent investigation and ultimate investment selection will be evaluated in light of the "character and aims" of the particular plan served.[9]
The regulations adopted by the United States Department of Labor to implement ERISA provide that the statutory obligation of prudence in connection with plan investments is satisfied if a fiduciary
"(i) Has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and
(ii) Has acted accordingly."[10]
"Appropriate consideration" includes, but is not necessarily limited to,
"(i) A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action, and
(ii) Consideration of the following factors as they relate to such portion of the portfolio:
(A) The composition of the portfolio with regard to diversification;
(B) The liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and
(C) The projected return of the portfolio relative to the funding objectives of the plan."[11]
The courts have held that a fiduciary's duty is not merely to maximize the return on investments but also to secure a just and reasonable return while avoiding undue risk.[12] Thus, if a particular investment yields sound returns at an acceptable level of risk, the court would deem the investment prudent. These same principles would similarly govern any divestiture decision taken by the SBA.
While this office cannot provide an exhaustive list of factors that may be considered by the SBA in making investment decisions, the SBA is under an obligation to consider those factors set forth in section 215.47(9), Florida Statutes (1996 Supplement), and must invest such funds to the fullest extent consistent with the cash requirements, trust agreement and investment objectives of the Fund. Moreover, the SBA must see that the monies invested are at all times handled in the best interests of the state and is required to discharge its duties solely in the interests of the Fund's participants and beneficiaries.
You question whether the SBA may rely solely on any one report and your staff's analysis of that report in making an investment decision regarding tobacco stocks. While a fiduciary may consider the reports of financial experts and its own staff, the fiduciary must independently assess the wisdom of an investment decision by reviewing the data, weighing its significance, and supplementing it when necessary. As fiduciaries, the SBA members have a duty to gather and analyze information relevant to the investment decision. Once such information has been obtained and thoroughly reviewed, the SBA must independently exercise its judgment based on the standards set forth above.
You also raise several questions regarding the potential liability of the SBA and its individual members should the board's divestiture decision result in a loss to the Florida Retirement System Trust Fund.
As discussed above, the Subchapter I provisions of ERISA apply only to private pension plans and are not applicable to governmental plans such as that administered by the SBA. While section 215.47(9), Florida Statutes (1996 Supplement), incorporates certain provisions of ERISA relating to the standard of care to be exercised by the SBA, it does not incorporate the personal liability provisions set forth in Subchapter I of the federal act. Thus, the personal liability provisions of ERISA have not been incorporated into Florida law and, therefore, are inapplicable to the management of the Florida Retirement System Trust Fund.[13] Moreover, section 215.47(9) provides no mechanism for imposing personal liability on an SBA member.
Where a common law or statutory duty exists, the Legislature has waived sovereign immunity in tort actions for operational level decisions.[14] Planning level decisions, however, remain immune. In determining whether government action is a planning or operational level decision, the courts have applied the following test:
1) Does the challenged act, omission, or decision necessarily involve a basic governmental policy, program, or objective?
2) Is the questioned act, omission, or decision essential to the realization or accomplishment of that policy, program, or objective as opposed to one which would not change the course or direction of the policy, program, or objective?
3) Does the act, omission, or decision require the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved?
4) Does the governmental agency involved possess the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act, omission, or decision?
If these questions are answered in the affirmative, then the governmental conduct is a planning level decision that is immune from liability.[15] If the conduct is an operational level decision, section 768.28(9), Florida Statutes (1996 Supplement), provides that public officers will not be held personally liable in tort unless they acted in bad faith or with malicious purpose or in a wanton and willful manner.
The Florida courts have held that reckless conduct is the equivalent of wanton and willful conduct.[16] In Bryant v. SchoolBoard of Duval County, Florida,[17] the plaintiffs sued the school board, the school principal, and a student club faculty adviser for injuries received by the student-plaintiff during a hazing incident. One count of the complaint, directed against the principal and the adviser, alleged the employees' conduct was "gross and reckless." The court construed the phrase "gross and reckless" to come within the ambit of the phrase "wanton and willful misconduct" as used in section 768.28(9). Thus, the court concluded that an action could be maintained against the employees in their individual capacities.
The courts have held that an action is within the scope of employment for purposes of section 768.28, Florida Statutes, even if it "though illegal, clearly was accomplished through an abuse of power lawfully vested in the officer, not an unlawful usurpation of power the officer did not rightfully possess."[18]
Moreover, a mere intentional tort does not trigger individual liability under section 768.28(9), but rather requires conduct "much more reprehensible and unacceptable than mere intentional conduct."[19]
Accordingly, I am of the opinion that the individual members of the SBA are not subject to personal liability under the provisions of ERISA in performing their fiduciary duties. Rather, state law would appear to govern any issue of personal liability against the individual members of the SBA. In order for the SBA to be liable for an investment decision that results in a loss to the Fund, the action taken by the SBA would have to constitute an operational level decision and a court would have to determine that a breach of fiduciary duty has occurred. An investment decision that merely results in a loss to the Fund would not, standing alone, subject the SBA to liability.
In addition, even if the SBA were to be held liable for a breach of its fiduciary duties, the individual members and staff of the SBA would be immune from liability pursuant to section 768.28(9), Florida Statutes, unless they acted wantonly and willfully, or in bad faith. As discussed above, however, the courts have required that the conduct must be much more reprehensible and unacceptable than mere intentional tortious conduct in order to trigger individual liability.
Your questions come at a time when the SBA, on behalf of all members of the retirement fund, is considering the wisdom of continued investment in tobacco companies. Like no other industry, the tobacco companies have been forced to defend their products and their practices against a withering barrage of legal attacks. The industry faces an unprecedented challenge to its continued viability from both private and governmental sectors. A majority of state attorneys general has brought suit to recover their respective states' Medicaid costs. Hundreds of private suits, including class action suits, have been brought, not only by smokers and their families but also by tobacco company shareholders. In addition, public sentiment — and with it, public policy — is rapidly shifting against the industry, making increased regulation of the industry likely.
Perhaps most importantly, a United States district court judge recently upheld the federal Food and Drug Administration's (FDA) authority to regulate tobacco as both a drug and a device.[20] The court rejected the tobacco industry's argument that Congress alone has the authority to regulate tobacco products. If this ruling is affirmed, the tobacco industry will face, for the first time, a regulatory environment in which the FDA has authority to direct how tobacco products are processed, labeled and sold to the public. This decision by a federal judge may be seen as a potent symbol of the tobacco industry's current and future unpredictability.
Taken in sum, the combination of these events makes the profitability of long-term investment in tobacco at best uncertain. No sooner had the federal court's decision been announced than tobacco stocks dropped. When the Liggett group settled the states' actions against it, tobacco stocks also plummeted. Reports of settlement discussions between the tobacco industry and the attorneys general, on the other hand, calmed the market. Investment in the stock market is by its nature uncertain; however, the risk of investment in tobacco stocks has dramatically increased due to the widespread litigation now faced by the industry and the uncertainty of the future regulatory climate. At this point it is impossible to know what the legal environment — and, therefore, the investment potential — will be for the business of selling tobacco products in one, two or five years.
In short, the tobacco industry is in an extremely volatile position, subject to the outcome of litigation, changing public opinion, and public policy decisions over which it has limited control. This volatile market environment places tobacco stock in a uniquely vulnerable position among investments.
Moreover, the state has charged the tobacco companies with racketeering in a civil action currently pending in Palm Beach County.[21] The judge in this case has determined that a jury may hear the state's evidence that the tobacco industry defendants constitute a racketeering enterprise. With that in mind, the state's investment of retirement funds in the tobacco industry is irreconcilable with its current attack on that industry for corrupt business practices, including the target marketing of cigarettes to children when every state prohibits the sale of tobacco to minors.[22]
With regard to any contemplated divestiture, the materials submitted to this office raise an issue regarding the potential transaction costs of divestiture. If the SBA determines that divestiture is proper, it may well devise a strategy to minimize the financial impact of such costs over a period of time. Sound management would dictate that staff examine the various options for divesting tobacco stocks with the goal of minimizing costs and risks to, and disruption of the orderly investment of, the Fund.
The unpredictability and uncertainty of the business of selling tobacco products appear to make the continued investment in such stock highly problematic. This instability is antithetical to the best interests of the members of the Fund, who are dependent on the Fund's settled predictability.
In recognition of these factors, an independent decision by the SBA to divest its tobacco stock after considering all these circumstances would appear to be consistent with the fiduciary duties imposed upon the State Board of Administration in managing the Florida Retirement System Trust Fund.
Sincerely,
Robert A. Butterworth Attorney General
RAB/tall
[1] Article XII, s. 9, Fla. Const., by reference to Art. IX, s. 16, 1885 Fla. Const., recognizes the creation of the SBA composed of the Governor, State Treasurer, and the State Comptroller, as a body corporate. And see, s. 16(b) of Art. IX, 1885 Fla. Const., which provides that in addition to management responsibilities over the Second Gas Tax, the SBA possess "such powers as may be conferred upon it by law"; and s. 20.28, Fla. Stat., stating that the SBA, continued by Art. XII, s. 9, Fla. Const., "retains all of its powers, duties, and functions prescribed by law."
[2] Section 215.44(1), Fla. Stat. (1996 Supp.). And see, s.121.021(36), Fla. Stat. (1996 Supp.), defining the Fund.
[3] Section 215.44(2)(a), Fla. Stat. (1996 Supp.).
[4] Subchapter II of Ch. 18 (ERISA) is entitled "Jurisdiction, Administration, Enforcement, Joint Task Force, Etc." Subtitle A of the subchapter contains provisions relating to the Treasury Secretary's issuance of determination letters concerning qualifications under the Internal Revenue Code (29 U.S.C. § 1201); continued compliance with Internal Revenue requirements (29 U.S.C. § 1202); prohibited transactions (29 U.S.C. § 1203); and coordination between the Department of Treasury and the Department of Labor (29 U.S.C. § 1204). Subtitles B and C of Subchapter II are entitled "Joint Pension, Profit-Sharing and Employee Stock Ownership Plan Task Force; Studies" and "Enrollment of Actuaries." Subchapter III of Ch. 18 (ERISA) concerns plan termination insurance. The above subchapters which address issues relating to taxation, tasks forces and studies, actuaries enrollment, and plan terminations, are not relevant to the questions you have posed.
[5] See, 29 U.S.C. § 1003(b). And see, 29 U.S.C. § 1002(32) defining the term "governmental plan" to mean "a plan established or maintained for its employees by the Government of the United States, by the government of any State or political subdivision thereof, or by any agency or instrumentality of any of the foregoing. . . ." See also, Hightower v. Texas HospitalAssociation, 65 F.3d 443 (5th Cir. 1995) (ERISA is a remedial statute enacted to encourage establishment of private pension plans; governmental plans are excluded from ERISA because of their ability to tax and thereby avoid the pitfalls of under-funding);Furia v. Furia, 638 A.2d 548 (R.I. 1994) (provisions of ERISA do not apply to governmental pension plans); Williams v. New CastleCounty, 970 F.2d 1260 (3d Cir. 1992) (none of ERISA provisions apply to governmental employees benefits plans).
[6] 29 U.S.C. s. 1109.
[7] Restatement (Second) of Torts s. 227 (1959), cmts. (a)-(c), (e), and (o).
[8] See, e.g., Roth v. Sawyer-Cleator Lumber Company,16 F.3d 915, 917-918 (8th Cir. 1994); Fink v. National Savings and TrustCompany, 772 F.2d 951, 955-956 (D.C. Cir. 1985); Katsaros v. Cody,744 F.2d 270, 279 (2d Cir. 1984), cert. denied, 469 U.S. 1072
(1984).
[9] See, e.g., Donovan v. Cunningham, 716 F.2d 1455, 1467 (5th Cir. 1983), cert. denied, 467 U.S. 1251 (1984).
[10] 29 C.F.R. s. 2550.404a-1(b)(1).
[11] 29 C.F.R. s. 2550.404a-1(b)(2).
[12] See, Board of Trustees of Employees' Retirement System ofCity of Baltimore v. Mayor and City Council of Baltimore City,562 A.2d 720 (Md. 1989), cert. denied sub nom., Lubman v. Mayor andCity Council of Baltimore City, 493 U.S. 1093 (1990).
[13] See, n. 4, supra.
[14] See, s. 768.28, Fla. Stat. (1996 Supp.). And see,
subsection (5) of the statute establishing the monetary limitations of the state's waiver of sovereign immunity at $100,000 for a claim or judgment by one person or $200,000 for all claims or judgments arising out of the same incident or occurrence.
[15] See, Trianon Park Condominium Association, Inc. v. City ofHialeah, 468 So.2d 912 (Fla. 1985). And see, Evangelical UnitedBrethren Church of Adna v. State, 407 P.2d 440 (Wash. 1965), quoted with approval by the Supreme Court of Florida in Trianon,supra.
[16] See, e.g., Williams v. City of Minneola, 619 So.2d 983
(Fla. 5th DCA 1993), in which the court concluded that reckless conduct is the equivalent of wanton and willful conduct for purposes of section 768.28(9), Florida Statutes.
[17] 399 So.2d 417 (Fla. 1st DCA 1981), reversed on othergrounds, Rupp v. Bryant, 417 So.2d 658 (Fla. 1982).
[18] See, e.g., McGhee v. Volusia County, 679 So.2d 729, 732
(Fla. 1996).
[19] See, Richardson v. City of Pompano Beach, 511 So.2d 1121,1123 (Fla. 4th DCA 1987), rev. denied, 519 So.2d 986 (Fla. 1988).
[20] Coyne Beahm, Inc. v. United States Food DrugAdministration, 1997 WL 200007 (M.D.N.C., filed April 25, 1997).
[21] State of Florida v. The American Tobacco Company, Case No. 95-1466 AH (15 Jud. Cir. Palm Beach Co., Fla. 1995).
[22] This office has been advised that the Denver Employees Retirement Plan divested its tobacco holdings approximating 1% of its portfolio. The retirement board liquidated its stock, concluding that it was not prudent to invest in companies against whom the city was participating in Medicaid/Medicare suits.